[No. D003520. Fourth Dist., Div. One. Dec. 23, 1986.]

ROBERTO BARRAGAN et al., Plaintiffs and Respondents, v.
BANCO BCH, Defendant and Appellant.

284

Counsel

David W. Steuber, Grace A. Carter, Martin D. Katz and Paul, Hastings, Janofsky & Walker for Defendant and Appellant.

John E. Ponder, J. Manuel Sanchez, Susan C. Groves and Virginia R. Gilson for Plaintiffs and Respondents.

## OPINION

**WIENER, J.**—Defendant Banco BCH appeals from a default judgment in favor of plaintiffs Roberto and Aida Barragan, two former depositors. Stated in this way there is little to distinguish Banco BCH's appeal from the routine appeals from default judgments frequently reviewed by this court. However, this case is unique in at least two ways. First, Banco BCH is a nationalized Mexican bank raising issues of foreign sovereign immunity and the act of state doctrine. Second, the default judgment totals $3 million— $1 million compensatory damages and $2 million punitive damages. The magnitude of the judgment, however, cannot be used as the basis for our decision. The amount is irrelevant. Every appeal from a default judgment touches upon the integrity of the judicial process and the due process right of the nonappearing defendant. Accordingly, careful appellate scrutiny is required in all cases regardless of the amount in controversy. After examining this case according to principles which govern all default judgments, we conclude the default was properly entered. We decide, however, the compensatory damages must be reduced to $500,000, the amount set forth in the prayer for relief. In reaching this conclusion we explain that because there were no motions pending to preclude entry of the default, court rules establish the period within which the bank was required to respond. We also discuss the reasons the bank failed to establish grounds for relief from entry of the default. As to the issue of punitive damages, we hold there is insufficient evidence to support the award and remand to allow the trial court to redetermine the proper amount of punitive damages in light of Banco BCH's net worth.

### FACTS

The Barragans owned and operated a garment business in Tijuana, Mexico. Aida, a United States citizen, managed the corporation. Roberto, a Mexican citizen with legal residency in the United States, was the president but worked primarily as a UPI correspondent. The Barragans owned a family residence in Chula Vista and rental property in San Ysidro.

In January 1978 the Barragans opened a commercial account for their garment business at the Tijuana branch of Banco BCH. Only Roberto and Aida were authorized to sign checks and make withdrawals from the account. In June 1978 the Barragans met Rafael Hernandez Moreno, the assistant manager of the Tijuana branch. On the bank's recommendation the Barragans hired Moreno as accountant for the corporation subject to his terminating employment with Banco BCH. Without the Barragans' knowledge Moreno continued to work for the bank.

During the nine months he was employed as the corporation's accountant, Moreno made unauthorized withdrawals of $176,244.24 from the Banco BCH account. It was later discovered other bank customers were given the same account number as the Barragans and their checks charged against the Barragans' account. Moreno disappeared when the Barragans' corporate checks started bouncing in March 1979. The bank refused to provide the Barragans with an accounting. Shortly thereafter Banco BCH reported Roberto Barragan to the Mexican police for fraudulent account shortages resulting from an alleged check kiting scheme. Roberto was arrested on May 23, 1979, convicted without trial and confined in a Mexican prison for almost two years. The bank's attorneys visited Roberto several times during his imprisonment and offered to dismiss the charges if he signed a form admitting the fraud. Roberto never accepted the offer. Banco BCH states it learned of Moreno's involvement only after Roberto's conviction.

A month after Roberto was imprisoned, the Mexican Labor Commission closed the corporation because the bank refused to honor payroll checks. By February 1981 the authorities had disposed of the corporation property and records. Because Roberto was in prison and Aida was unable to enter Mexico due to an outstanding arrest warrant, neither could protect the property.

PROCEDURAL BACKGROUND

*The First Action: Banco BCH v. Barragan (Super. Ct. No. 437704)*

In July 1979 Banco BCH sued the Barragans and Moreno in San Diego Superior Court for conversion, fraud, conspiracy and common counts (the first action). The bank attached an $18,397 promissory note and the two parcels of real property owned by the Barragans in California.

After Roberto was released from prison, the Barragans sought leave to file a cross-complaint in the first action alleging conversion, fraud and deceit, conspiracy, negligence, breach of contract, false imprisonment and requesting an accounting. The court denied the Barragans' motion without

prejudice to their filing a separate lawsuit. The court ruled the cross-complaint was not compulsory.

After a jury trial in July 1982, the court directed a verdict in favor of the Barragans on the fraud, conversion and conspiracy counts. By special verdict the jury set damages on the common count at $30,000 and reduced the damages by 80 percent due to Banco BCH's negligence. The final judgment ordered the Barragans to pay the bank $9,000 together with costs and interest.

*The Second Action: Barragan v. Banco BCH (Super. Ct. No. 482016)*

After the court denied Barragans' motion for leave to file a cross-complaint and before the first action was tried, plaintiffs filed this action against Banco BCH for conversion, accounting, fraud and deceit, conspiracy, negligence, breach of contract and false imprisonment. The Barragans alleged Banco BCH and Moreno converted $176,244.24 in the Barragans' account and wrongfully complained to the Mexican authorities causing Roberto's arrest and imprisonment.

Because of its relevance to the sovereign immunity defense and motions for relief from default and default judgment, we detail the procedural chronology of the Barragans' lawsuit against Banco BCH in later sections of this opinion. To summarize briefly, Banco BCH moved for partial summary judgment on the false imprisonment count and demurred on grounds the first action was pending. The parties agreed to take the motions off calendar pending resolution of the first action. After judgment in the first action and while the bank's motions were still unresolved, the bank unsuccessfully moved to dismiss the Barragans' lawsuit on grounds of res judicata. The court's order denying the motion was entered on July 6, 1984. After warning Banco BCH of the consequences of failure to answer within the time prescribed by law, the Barragans entered default against the bank on July 20, 1984.

On January 14, 1985, Banco BCH unsuccessfully moved to set aside the default on grounds of excusable neglect, mistake and inadvertence. The proposed answer set forth the single affirmative defense of res judicata.

At the May 31, 1985, "prove-up" hearing, the Barragans testified regarding damages incurred through the loss of their business, loss of funds in the Banco BCH account, and forced sale of real and personal property. Roberto testified about the emotional problems he suffered as a result of his incarceration in the Mexican prison. The court found the Barragans had proved damages of at least $1 million and granted compensatory damages

in that amount based on the allegations of the complaint. Because there was a question whether compensatory damages were limited by the amount stated in the prayer of the complaint, the court said it would award $500,000 in compensatory damages if it lacked the power to award the higher amount. The court also awarded punitive damages of $2 million representing less than three percent of the bank's net worth. The court denied Banco BCH's motion to vacate the default judgment. This appeal ensued.

DISCUSSION

I.

We first consider the question of the court's jurisdiction to enter judgment against Banco BCH. The bank argues it is immune from both personal and subject matter jurisdiction under the Foreign Sovereign Immunities Act of 1976 (FSIA), 28 United States Code sections 1330, 1332(a)(2), (4), 1391 (f), 1441(d) and 1602-1611. Banco BCH also claims the act of state doctrine bars any attempt to review and condemn acts of the sovereign state of Mexico through a ruling on the Barragans' false imprisonment claim.

A.

*The Foreign Sovereign Immunities Act*

Congress enacted the FSIA to provide a comprehensive approach to questions of sovereign immunity of foreign states. Title 28 United States Code section 1603 defines the entities to which the FSIA applies and states: "For purposes of this chapter—

"(a) A 'foreign state,' . . . includes . . . an agency or instrumentality of a foreign state as defined in subsection (b).

"(b) An 'agency or instrumentality of a foreign state' means any entity— (1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country." (28 U.S.C. § 1603(a) and (b).)

Mexican president Jose Lopez Portillo nationalized Banco BCH in September 1982, seven months after the Barragans filed this lawsuit. The

president's decree provided for immediate expropriation of the assets of private Mexican banking institutions with compensation to be paid to shareholders over a period of 10 years. ("Decree Declaring the Nationalization of the Private Banks," published in the *Diario Oficial* of Mexico on Sept. 1, 1982.) As a corporate entity a majority of whose shares are owned by the government of Mexico, Banco BCH is an "agency or instrumentality" of a foreign state. (See *Arango* v. *Guzman Travel Advisors Corp.* (5th Cir. 1980) 621 F.2d 1371 (airline wholly owned by the Dominican Republic is a "foreign state"); *Carey* v. *National Oil Corp.* (S.D.N.Y. 1978) 453 F. Supp. 1097 (oil corporation wholly owned by the Libyan government is a "foreign state").)

Under the FSIA, foreign states are immune from suit unless the conduct complained of comes within one of the statutory exceptions (28 U.S.C. § 1604), including those actions in which the foreign state has explicitly or impliedly waived its immunity. (28 U.S.C. § 1605(a)(1).) The legislative history of this provision gives one example of implied waiver relevant to this case. Waiver is implied where a foreign state files a responsive pleading without raising the defense of sovereign immunity. (H.R.Rep. No. 94-1487, 2d Sess. p. 18 (1976), reprinted in 1976 U.S. Code Cong. & Admin. News 6604, 6617; Sen.Rep. No. 94-1310, 2d Sess. p. 18 (1976).) ". . . Congress anticipated, at a minimum, that waiver would not be found absent a conscious decision to take part in the litigation and a failure to raise sovereign immunity despite the opportunity to do so." (*Frolova* v. *Union of Soviet Socialist Republics* (7th Cir. 1985) 761 F.2d 370, 378.)

For the most part federal courts have followed the guidelines established by Congress implying a waiver only where the defendant has filed a responsive pleading without waiving the FSIA defense. (See, e.g., *Sea Lift* v. *Refinadora Costarricense de Petroleo* (S.D.Fla. 1984) 601 F.Supp. 457.) Because the Federal Rules of Civil Procedure distinguish between pleadings and motions (see Fed. Rules Civ. Proc., rules 7(a), 7(b), 12(a) and 12(b), 28 U.S.C.), the filing of a motion to dismiss does not necessarily waive the defense. (*Canadian Overseas* v. *Compania de Acero* (2d Cir. 1984) 727 F.2d 274, 277.) And even though here we could distinguish the federal precedent by pointing out that a demurrer is a pleading under California law (Code Civ. Proc., § 422.10)[1] we are unwilling to rest our decision on such a procedural nicety. Instead we recognize Congress' concern with the gravity of this type of waiver, accepting recent federal case authority which acknowledges the court's "discretion to determine that the conduct of a party in litigation does constitute a waiver of foreign sovereign immunity in light of

---

[1]All statutory references are to the Code of Civil Procedure unless otherwise specified.

the circumstances of a particular case." (*Canadian Overseas* v. *Compania de Acero, supra,* 727 F.2d at p. 278.)

 Where there is no exception to foreign sovereign immunity the court lacks both subject matter and personal jurisdiction. (*Verlinden B.V.* v. *Central Bank of Nigeria* (1983) 461 U.S. 480, 485, fn. 5 [76 L.Ed.2d 81, 86-87, 103 S.Ct. 1962].) In spite of the cautious factual determination that must be made after the issue of foreign sovereign immunity has been presented and rebutted by a prima facie showing of waiver, the party claiming immunity nonetheless retains the burden of establishing none of the exceptions apply. (*Arango v. Guzman. Travel Advisors Corp., supra,* 621 F.2d at p. 1378.) Here, based on the litigation history between these parties, Banco BCH has failed to sustain its burden.

Initially we point out that the bank's resistance to the Barragans' motion seeking to cross-complain in the first action was not based on any theory of immunity. We are uncomfortable with the notion that a party would be able to skew the justice system by using the California courts to collect money through the judicial process while remaining immune from suit thereby precluding legitimate offsets or deductions. Our notion of discomfort is reflected in section 1607(b) which provides that a foreign state shall not be accorded immunity with respect to any counterclaim "arising out of the transaction or occurrence that is the subject matter of the claim of the foreign state" brought in federal or state court (28 U.S.C. § 1607(b)). The legislative history of this section states: "Certainly, if a foreign state brings or intervenes in an action based on a particular transaction or occurrence, it should not obtain the benefits of litigation before U.S. courts while avoiding any legal liabilities claimed against it and arising from that same transaction or occurrence." (H.R. Rep. No. 1487, 94th Cong., 2d Sess., p. 23 (1976) reprinted in 1976 U.S. Code Cong. & Admin. News 6604, 6622.)

In addition to the potential unfairness in the first action, the bank never asserted the sovereign immunity defense until July of 1985. A brief review of those proceedings shows the following:

4/19/82 Banco BCH unsuccessfully moved to quash service on grounds of improper service and lack of personal jurisdiction.

5/20/82 Banco BCH moved ex parte for dismissal and sanctions for alleged willful misrepresentation regarding service of process; the request was later withdrawn.

5/21/82 Banco BCH moved for partial summary judgment (false imprisonment count), demurred (pendency of first action) and sought abatement of the second action pending resolution of the first action; motion and demurrer taken off calendar by agreement of counsel pending determination of the first action.

5/9/84 Banco BCH unsuccessfully moved to dismiss on grounds of res judicata and that the Barragans' action should have been filed as a compulsory cross-complaint in the first action.

The proposed answer filed with the bank's motion to set aside default on January 14, 1985, pleaded the single affirmative defense of res judicata. There was no mention of the sovereign immunity defense. Banco BCH asserted the FSIA defense for the first time in its July 1985 motion for order vacating entry of default and default judgment. And although we do not suggest that the bank was required to assert the defense when it first became aware of the likelihood that private Mexican banking institutions were to become nationalized, it certainly had ample opportunity to promptly do so afterward. In these circumstances BCH waived the sovereign immunity defense by failing to timely raise it when it had sufficient time and opportunity to do so.

We also believe the doctrine of sovereign immunity should not be applied retroactively here. At the time the Mexican banks were nationalized the present litigation was pending and a part of that commercial dispute had already been reduced to judgment in favor of the bank. We have not been directed to any part of the presidential decrees manifesting a governmental intent that the nationalization of banking institutions was to immunize specific private banks who were then defendants in state litigation. Mexico's intent not to provide such immunity is certainly understandable in light of the potentially disruptive effect such a decision would have on other governments legitimately concerned with the adequacy of legal redress in pending actions against Mexican banks. To divest the California court of jurisdiction in this case would be contrary to the purpose of the statute, inconsistent with the decree nationalizing Mexican banks and result in the anomaly of Banco BCH's receiving the benefits of our court system while denying those benefits to our residents. The court had personal and subject matter jurisdiction to enter the default judgment.

### B.

#### The Act of State Doctrine

■ The act of state doctrine precludes judicial inquiry into the validity of public acts of foreign sovereigns committed within their own territory. (*Banco Nacional de Cuba* v. *Sabbatino* (1964) 376 U.S. 398, 401 [11 L.Ed.2d 804, 808, 84 S.Ct. 923].) Court adjudications involving the legality of actions by a foreign state on its own soil might embarrass the executive branch of government in its conduct of foreign relations. (*Alfred Dunhill of London, Inc.* v. *Cuba* (1976) 425 U.S. 682, 697 [48 L.Ed.2d 301, 313, 96

S.Ct. 1854].) However, the doctrine does not prevent judicial resolution of commercial consequences arising from a foreign government's public acts. (*Arango* v. *Guzman Travel Advisors Corp., supra,* 621 F.2d at pp. 1380-1381; see also *National American Corp.* v. *Fed. Rep. of Nigeria* (S.D.N.Y. 1978) 448 F.Supp. 622, 639-640.) Nor does the doctrine apply to commercial acts of nationalized corporations. (See, e.g., *Alfred Dunhill of London, Inc.* v. *Cuba, supra,* 425 U. S. 682.)

Because the act of state doctrine is merely an issue preclusion device (*Arango* v. *Guzman Travel Advisors Corp., supra,* 621 F.2d at p. 1380; *National American Corp.* v. *Fed. Rep. of Nigeria, supra,* 448 F.Supp. at p. 640), it does not affect the power of the court to enter a default judgment. Here the court had jurisdiction to proceed after the entry of the default to award a judgment adverse to the bank. In effect the bank's contention seeks to transmute an argument on the merits to one of jurisdiction. It is exactly because the court legitimately exercised its power to proceed by default which prevents the bank from doing so. Accordingly we do not address the merits of this defense and the applicability of the act of state doctrine to the false imprisonment cause of action.

## C.

### Res Judicata

Banco BCH also contends the court erred in denying its motion to dismiss on grounds of res judicata. We cannot ignore the implications of subjecting a party to repeated litigation on the same issue in terms of both judicial economy and unfairness to the individual litigant. On the other hand, res judicata is an affirmative defense that may be waived and a defendant's conduct in prior proceedings may preclude assertion of the defense. (*Sawyer* v. *First City Financial Corp.* (1981) 124 Cal.App.3d 390, 410 [177 Cal.Rptr. 398] (conc. opn. of Wiener, J.).)

Here the court properly concluded it was bound by Judge Langford's finding that the cross-complaint offered in the first action was not a compulsory cross-complaint and that the Barragans could file a separate action without prejudice. The judgment in the first action is now final and was never appealed. The determination of a question of law in a prior action between the parties may be given effect as a collateral estoppel in a subsequent action between the parties so long as injustice does not result. (7 Witkin, Cal. Procedure (3d ed. 1985) Judgment, §§ 274-275, pp. 714-715.) Furthermore, although the bank and the Barragans were parties to the first and second actions, the causes of action were not the same.

Of equal importance is the conduct of the bank. Banco BCH opposed the Barragans' motion for leave to file a cross-complaint in the earlier action. The Barragans were eager to combine discovery and defenses in both cases and proceed to trial after a short continuance of the trial date. Having successfully blocked the Barragans' attempt to file a cross-complaint, Banco BCH now contends the issues raised in this action are res judicata because they might have been adjudicated in the first action. Litigants may not successfully adopt such inconsistent positions. The bank's conduct in the first action is " 'tantamount to an express determination on the part of the court with the consent of opposing counsel to reserve the issues involved for future adjudication.' " (*Lunsford* v. *Kosanke* (1956) 140 Cal.App.2d 623, 628-629 [295 P.2d 432].) We therefore conclude the court did not err in denying Banco BCH's motion to dismiss.

## II.

Having disposed of the challenge to the court's power to enter the default judgment, we now address the circumstances under which the court entered the default and default judgment against the bank.

Banco BCH first contends its filing of a motion for partial summary judgment, demurrer and motion to dismiss precludes entry of default. The bank also argues the default was improper because neither plaintiffs nor the court told the bank when its answer was due. Finally, Banco BCH asserts counsel's failure to file an answer after denial of the motion to dismiss was excusable neglect under section 473.

## A.

### 1. *The demurrer.*

Sections 585 and 586 authorize the clerk of the court to enter a default unless the defendant files an answer, demurrer or other designated motion within the time specified in the summons or allowed by the court. The procedure attempts to balance concerns of fairness and due process with the need for efficiency in the administration of justice. Therefore, where the defendant has made a general appearance of the type listed in the statute, plaintiff may not obtain entry of default by action of the clerk; some action by the court is required. Typically, the plaintiff must obtain a favorable ruling by the court on a noticed motion to strike before the default may be entered.

Banco BCH's demurrer to the Barragans' complaint in May 1982 asserted that another action was pending which involved substantially the

same causes of action and issues. (§ 430. 10, subd. (c).) In the context of this case this demurrer presents an interesting question. Under the foregoing cited statutes a demurrer is the type of pleading which precludes the clerk from entering a defendant's default. Here, however, the effect of the bank's demurrer was only to abate the second action, not its dismissal. In any event, before the court had an opportunity to rule, the parties treated the demurrer as well taken and removed it from the court's calendar. In practical terms counsel for the Barragans recognized the likelihood that the demurrer might be sustained. In order to avoid burdening the court with a legal argument which probably would have been an exercise in futility, he agreed to forego pursuing the later action until the first action was completed. Taking the case off calendar was the functional equivalent of allowing the court to sustain the demurrer. This resulted, however, in only postponing the second action not eliminating it. The postponement period would end when the first action became final. Thus here since the request to enter the default was made after the first action was concluded, the operative effect of the demurrer had ceased. Moreover for the bank to suggest now that its demurrer remained an impenetrable obstacle precluding the entry of the default overlooks its conduct and the Barragans' counsel's reasonable belief that the bank's demurrer had long since been abandoned. More than a year after entry of judgment in the first action, the Barragans' counsel made three verbal and written requests that the bank recalendar the demurrer. All were unsuccessful. We can understand why the bank refused to cooperate in recalendaring the matter. As we have explained, once the first action was resolved, the demurrer became moot. In these circumstances the court would have denied any request to recalendar the demurrer since the first action was no longer pending.

We would like to think that in spite of bureaucracy, a clerk entering a default is permitted to exercise his or her common sense and ignore a demurrer that is more than moribund. In every legal sense the demurrer was dead. Even the bank's counsel did not manifest a belief the demurrer had vitality. If he had that belief we presume he would have promptly moved to set aside the default on that ground.

This case is different than *Laguna Village, Inc.* v. *Laborers' Internat. Union of North America* (1983) 35 Cal.3d 174 [197 Cal.Rptr. 99, 672 P.2d 882]. There the plaintiff sued the defendant labor union for trespass based on unlawful entry onto a jobsite. After removing the case to federal court, the union filed a motion to dismiss for lack of jurisdiction. When plaintiff's motion for remand was granted, the federal court declined to consider the motion to dismiss. Plaintiff obtained a default after the union failed to answer the complaint within the time allowed after remand. (*Id.,* at p. 177.) In reversing the clerk's entry of default and the trial court's denial of defen-

dant's motion for relief, the California Supreme Court concluded the motion to dismiss filed in federal court was sufficiently similar to a demurrer to constitute a responsive pleading for the purposes of avoiding entry of default. (*Id.,* at p. 182.)

Here, the demurrer filed in May 1982 had been pending for two years when the default was entered. The bank effectively abandoned its demurrer by not recalendaring it after numerous requests to do so by plaintiffs' counsel and the demurrer itself became moot because there was no longer another action pending.

2. *The motion for summary judgment.*

■ A motion for summary judgment is not a pleading under sections 420 and 422.10. Nor is it mentioned among the motions which preclude entry of default judgment under section 585. The bank's motion for partial summary judgment was filed in May 1982 as a companion motion to the demurrer. It, too, was taken off calendar and remained unresolved over two years later when the default was entered. Banco BCH never argued the summary judgment motion barred entry of default in its motions for relief before the trial court.

3. *The motion to dismiss.*

■ A motion to dismiss may be substituted for a demurrer as the first pleading. If denied, it is treated as an overruled demurrer. (*McKay* v. *County of Riverside* (1959) 175 Cal.App.2d 247, 249 [345 P.2d 949].) ■ Banco BCH filed a motion to dismiss the Barragan complaint on grounds of res judicata and the order denying the motion was entered on July 6, 1984. The time within which Banco BCH was required to file an answer ran from that date. Accordingly, there was no motion or demurrer pending in this action which would preclude entry of default.

B.

■ If a defendant fails to answer the complaint "within the time allowed by the court" after a demurrer is overruled, a default may be entered under section 585. The defendant has 10 days to file an answer if a party fails to request additional time and no time is stated by the court. (Cal. Rules of Court, rule 325(e).) If a defendant plans to file a petition for writ of mandate, a notice of filing is required to prevent entry of default. (§ 585, subd. (a).) The shorter period of time—10 days—may be a trap for the unwary. Lawyers experienced in law and motion are sensitized to the disparate periods of time and routinely request a longer response time in

open court at the close of the hearing. Here neither the court's order nor the plaintiffs' notice of ruling stated when Banco BCH's answer was due. Therefore, rule 325(e) controls.

But more important to our inquiry is the history of the contacts between plaintiffs' counsel, John Ponder, and Banco BCH's attorney, Pieter Speyer, in the days immediately preceding entry of default against the bank. Because of the significance of an entry of default, our awareness of the policy favoring trial on the merits, and the unfairness of visiting the client with the lawyer's neglect (see *Hurtado* v. *Statewide Home Loan Co.* (1985) 167 Cal.App.3d 1019 [213 Cal.Rptr. 712]), we outline the events in some detail.

Following the hearing on the motion to dismiss on July 2, 1984, Attorney Ponder and his cocounsel discussed the court's ruling with Speyer in the coffee shop adjacent to the law and motion department of superior court. Plaintiffs' counsel informed Speyer that because of his dilatory defense, the Barragans had given instructions not to grant any extensions of time to respond or file a writ of mandate and to file a default in the event Banco BCH did not timely file a response or petition for writ of mandate. Seven days later Ponder and his cocounsel confronted Speyer on a street near the courthouse and again advised Speyer they would enter a default against Banco BCH if a response or petition for writ of mandate were not filed within the time prescribed by law. On July 11, 1984, Speyer contacted Ponder and requested an extension of time in which to file a petition for writ of mandate. Ponder again informed Speyer his clients had instructed him not to grant any extensions and to enter the default in the event a response or petition for writ of mandate were not filed on time. Ponder also advised Speyer the same day that he would meet him in the law and motion department if Speyer elected to seek an ex parte extension of time. These conversations show both parties were well aware of the date the bank's response was due. The Barragans waited an additional week before filing their request to enter default. There was no further contact between Ponder and Speyer until January 14, 1985, about one week before the expiration of the six month period under section 473 when Speyer sought an ex parte order shortening time to permit filing of the motion to set aside the default.

## C.

■ We also conclude the court did not err in denying Banco BCH's motion for relief from default. ■ Section 473 permits the trial court to ". . . relieve a party . . . from a judgment, order, or other proceeding taken against him or her through his or her mistake, inadvertence, surprise or excusable neglect. . . ." The burden is on the moving party to show good cause for relief. (*Marcotte* v. *Municipal Court* (1976) 64 Cal.App.3d 235,

239 [134 Cal. Rptr. 314].) A motion seeking such relief is within the sound discretion of the trial court and its exercise will not be disturbed absent an abuse of discretion. (*Elston* v. *City of Turlock* (1985) 38 Cal.3d 227, 233 [211 Cal.Rptr. 416, 695 P.2d 713].) However, unless inexcusable neglect is clear, the strong policy favoring trial on the merits prevails resulting in reversal of an order denying relief. (*Id.,* at p. 235.)

Plaintiffs served Speyer with the entry of default on July 25, 1984. It was almost six months later when the bank moved to set aside the default on January 14, 1985. ▮▮▮▮ The bank presented no facts to show the default was taken through inadvertence, surprise, mistake or excusable neglect. Speyer acknowledged receipt of the notice of default and stated he "mistakenly believed that the clerk's default in this action would not be conclusive, but would require plaintiffs' prove-up before the statutory time would begin to run against his client." His later research showed the error in that belief. Speyer's declaration continued: "In the meantime, your declarant suffered numerous changes in secretarial personnel in his office, and removed his offices to a new location. During the move, defendant's voluminous files were inadvertently misplaced. Subsequently, in December 1984 your declarant received an inquiry about the instant matter from defendant's new corporate counsel in Mexico. A search for the file at that time produced the boxes which had been mistakenly placed in storage." The events raised as an excuse each occurred after the default had been entered and relate only to Speyer's diligence in seeking relief on behalf of his client. The bank's motion for relief from judgment included no new facts to support its claim for relief. While we recognize the remedial nature of section 473 and the value of a policy that encourages trial on the merits, relief is not warranted in every case. " 'The policy that the law favors trying all cases and controversies upon their merits should not be prostituted to permit the slovenly practice of law or to relieve courts of the duty of scrutinizing carefully the affidavits or declarations filed in support of motions for relief to ascertain whether they set forth, with adequate particularity, grounds for relief. [Fn. omitted.] When inexcusable neglect is condoned even tacitly by the courts, they themselves unwittingly become instruments undermining the orderly process of the law.' " (*Carroll* v. *Abbott Laboratories, Inc.* (1982) 32 Cal.3d 892, 900 [187 Cal.Rptr. 592, 654 P.2d 775], quoting *Transit Ads, Inc.* v. *Tanner Motor Livery, Ltd.* (1969) 270 Cal.App.2d 275, 282 [75 Cal.Rptr. 848].)

### III.

Banco BCH next argues the evidence presented by the Barragans at the "prove-up" hearing is insufficient to support a $3 million judgment. With respect to compensatory damages, the bank says Aida Barragan was incom-

petent to testify about the value of the lost business and residence. Banco BCH also asserts the court's punitive damage award was based on insufficient evidence of the bank's net worth and was excessive as a matter of law.

■ Plaintiffs in a default judgment proceeding must prove they are entitled to the damages claimed. (§ 585; *Taliaferro* v. *Hoogs* (1963) 219 Cal.App.2d 559, 560 [33 Cal.Rptr. 415].) Evidence Code section 813 expressly states that the owner or spouse of the owner of property being valued is competent to express an opinion as to value. Mrs. Barragan's testimony is sufficient to support judgment for compensatory damages based on that valuation. (*Schroeder* v. *Auto Driveaway Co.* (1974) 11 Cal.3d 908, 921 [114 Cal.Rptr. 622, 523 P.2d 662].)

■ We nonetheless conclude there is insufficient evidence to support the punitive damage award as a percentage of the bank's net worth. Aida Barragan first testified Banco BCH was worth 218 billion pesos. When the court asked, "Are we dealing in billions?" Mrs. Barragan corrected her testimony and stated the number was in millions. The court later reviewed the document on which Mrs. Barragan relied for her testimony on the bank's value and stated: "The figure appears to be two hundred thirty-two million. If that is pesos, the entire value of the bank is less than $1,000,000, by my calculation. . . . Perhaps this is set forth in thousands. Is it set forth in thousands?" Referred by Attorney Ponder to another section of the document, the court stated it agreed the number was in thousands of pesos. The court then awarded $2 million in punitive damages as approximately two percent of the net assets of Banco BCH. The document was never offered or received into evidence.

Given the confusion regarding the figure representing the bank's net worth, we believe the documentary evidence should have been formally received as an exhibit. If, as Aida Barragan earlier testified, the bank's net worth is only 218 million pesos, or approximately $872,000 at 250 pesos per dollar, a $2 million judgment represents more than twice the bank's net worth. Such an award would be unconscionable and excessive as a matter of law. (*Uva* v. *Evans* (1978) 83 Cal.App.3d 356 [147 Cal.Rptr. 795].) We therefore reverse the $2 million punitive damage judgment and remand this case to the superior court for redetermination of the bank's net worth. The trial court may permit the Barragans to submit additional documentary evidence, if necessary, and/or set the case for further proceedings to insure that the judgment is supported by a complete and accurate record. (See § 585, subd. (b); *Devlin* v. *Kearny Mesa AMC/Jeep/Renault, Inc.* (1984) 155 Cal.App.3d 381, 386 [202 Cal.Rptr. 204].) Banco BCH is not entitled to participate in any manner in the second judgment hearing on the issue of

its net worth. (*Devlin* v. *Kearny Mesa AMC/Jeep/Renault, Inc., supra,* 155 Cal.App.3d at pp. 386-387.)

## IV.

Banco BCH asserts the Barragans' failure to provide the defendant with a statement of damages prior to entry of default judgment renders the judgment void. The bank also maintains the court acted in excess of its jurisdiction in awarding compensatory damages greater than the amount demanded in the prayer of the complaint.

## A.

 Section 425.10, subdivision (b) prohibits a personal injury plaintiff from stating in the complaint the amount of damages claimed in order to protect defendants in these actions from adverse publicity resulting from inflated damage claims. (*Plotitsa* v. *Superior Court* (1983) 140 Cal.App.3d 755, 759 [189 Cal.Rptr. 769].) A defendant may request a statement of the nature and amount of general and special damages and the plaintiff must give notice to the defendant of the amount sought before a default may be taken. (§ 425.11.) A default judgment entered without giving the required notice is void. (*Stevenson* v. *Turner* (1979) 94 Cal.App.3d 315 [156 Cal.Rptr. 499].) The reason for this is that since "default judgment ends the controversy, the rules leading to it are precise and should be followed to the letter. Where a plaintiff fails to adhere to those rules, a defendant need not suffer the consequences a default judgment brings." (*Jones* v. *Interstate Recovery Service* (1984) 160 Cal.App.3d 925, 928 [206 Cal.Rptr. 924].) "Section 425.11 was designed to give a defendant 'one "last clear chance" to respond to the allegations of the complaint and to avoid the precise consequences . . . [of] a judgment for a substantial sum . . . [without] any actual notice of . . . potential liability.' [Citation omitted.] Leaving out a step in the process can hardly be deemed 'one last *clear* chance.' " (*Id.,* at pp. 928-929.)

The *Jones* court also decided that even though some of the causes of action did not involve damages for personal injuries, the judgment setting aside the default should be affirmed in the entirety on the ground plaintiffs' nonpersonal injury claims were tied so closely to the personal injury claims that section 425.11 applied to all causes of action. (At p. 930.) In making a similar argument here Banco BCH claims that we should reverse because the damages for false imprisonment are so intertwined with other damages that the judgment is void. That assertion is factually and legally unsupported.

We first point out the court made a single award of damages and the judgment does not apportion the recovery between Roberto Barragan and his wife, Aida. It was only Roberto who sought damages for his pain and mental anguish and for his past and future medical expenses caused by his false imprisonment. Aida did not seek such damages. Both plaintiffs alleged other theories of recovery in their causes of action for conversion, fraud, conspiracy, negligence and breach of contract. Aida Barragan's testimony tracked these allegations and not those alleged in the cause of action for false imprisonment. She testified that the loss of their business was caused by Banco BCH's refusal to honor checks. The value of the corporation at that time was $692,000 and consequently she and her husband were damaged in that amount. She also explained that because the bank failed to honor checks and the loss of her business she was required to raise money quickly resulting in the forced sale of her house. This resulted in an additional $65,500 loss.

Thus unlike *Jones* the damages attributable to Roberto Barragan's false imprisonment claim are not so intertwined with the economic loss sustained by both plaintiffs that it is necessary to void the judgment. ■ In so acting, we do so consistent with the general rule that an appellate court has the power to disregard a particular cause of action in order to affirm the judgment on any theory which is supported by the evidence. (See *Crogan v. Metz* (1956) 47 Cal.2d 398, 403 [303 P.2d 1029].) As discussed above there is ample evidence to support an award of $500,000 general damages.

■ Not only are the damages caused by Banco BCH's false imprisonment of Roberto Barragan and the remaining damages clearly isolated when viewed retrospectively, there is no way Banco BCH could have been prejudiced by the Barragans' complaint when examined prospectively. The complaint contained only a single cause of action for false imprisonment. The remaining five causes of action were directed to the bank's role in permitting unauthorized withdrawals from the Barragans' checking account. The specific damage allegations in the third and fourth causes of action, the prayer for relief, and the request to enter default provided Banco BCH with actual notice of its potential liability. In light of the allegations of each of these causes of action the bank was not prejudiced by the Barragans' failure to provide it with a statement of damages in the false imprisonment claim. The $1 million in damages claimed in the third and fourth causes of action gives ample support to the $500,000 general damages claim set forth in the prayer for relief excluding any of the damages alleged as part of the false imprisonment cause of action. We are satisfied that none of the damages sought for false imprisonment taint this judgment and therefore reject Banco BCH's contention that section 425.11 which pertains solely to the

plaintiffs' false imprisonment cause of action should void the entire judgment.

### B.

Section 580 provides that "[t]he relief granted to the plaintiff, if there be no answer, cannot exceed that which he shall have demanded in his complaint; . . . ." "Section 580, and related sections 585, 586, 425.10 and 425.11, aim to ensure that a defendant who declines to contest an action does not thereby subject himself to open-ended liability. Reasoning that a default judgment that exceeds the demand would effectively deny a fair hearing to the defaulting party, the Courts of Appeal have consistently read the code to mean that a default judgment greater than the amount specifically demanded is void as beyond the court's jurisdiction." (*Greenup* v. *Rodman* (1986) 42 Cal.3d 822, 826 [231 Cal.Rptr. 220, 726 P.2d 1295].) In all default judgments, the demand sets the ceiling on recovery. (*Id.*) A defendant who decides to default need not examine the allegations of the complaint to determine the extent of liability if the case were contested. (6 Witkin, Cal. Procedure (3d ed. 1985) Proceedings Without Trial, § 251, at p. 549.)

Amounts of damages claimed in the Barragans' complaint are inconsistent. Three of the six causes of action allege specific amounts of compensatory damages: $200,000 in the first cause of action for conversion; $1 million in the third cause of action for conspiracy, and $1 million in the fourth cause of action for negligence. Each cause of action alleges additional compensatory damages subject to proof at trial. The first three causes of action allege punitive damages of $3 million. In the prayer of the complaint the Barragans request general damages of $500,000 and punitive damages of $3 million. Because the prayer for relief controls, we modify the default judgment to provide for compensatory damages in the amount of $500,000.

### DISPOSITION

Judgment modified in part, reversed in part, and remanded to permit the trial court's redetermination of Banco BCH's net worth. Banco BCH to bear all costs for this appeal.

Kremer, P. J., and Work, J., concurred.

A petition for a rehearing was denied January 22, 1987, and appellant's petition for review by the Supreme Court was denied March 18, 1987.