**Lavern J. CHATMAN, Appellant,**

v.

**James L. LAWLOR, et al., Appellees.**

**James L. Lawlor, et al., Appellants,**

v.

**Lavern J. Chatman, Appellee.**

**No. 01–CV–854, 01–CV–861.**

District of Columbia Court of Appeals.

Argued Dec. 17, 2002.
Decided Sept. 4, 2003.

David J. Cynamon, with whom Matthew A. Anzaldi was on the brief, Washington, DC, for Lavern Chatman.

Paul H. Zukerberg, Washington, DC, for James L. Lawlor, et al.

Before TERRY, RUIZ, and GLICKMAN, Associate Judges.

TERRY, Associate Judge:

Appellant, Lavern Chatman, seeks reversal of the trial court's decision to hold her jointly and severally liable for $1.4 million in punitive damages because of her involvement in a fraudulent conveyance. Appellant argues (1) that there was insufficient evidence of malice to permit the court to award punitive damages, and insufficient evidence of her· net worth to support an award in that amount; (2) that

the trial court abused its discretion by refusing to hear testimony—which was available but not presented at trial—about her net worth before denying her post-trial Rule 60(b) motion; and (3) that the award of punitive damages was so excessive that it violated her due process rights. We affirm the trial court's finding of liability and its denial of appellant's post-trial motion, but remand for further proceedings to determine her net worth and the appropriate measure of damages. Because appellant's net worth was not adequately established at trial, we do not reach her due process argument.

I

In 1996, a group of 297 plaintiff-employees of the J.B. Johnson Nursing Home ("the employees") brought a class action against Urban Shelters & Healthcare, Inc., the company that managed the nursing home, alleging violations of the District of Columbia wage payment law. *See* D.C.Code § 36–108 (1997). Urban Shelters was a private corporation of which Roy Littlejohn owned all the stock. Also named as defendants were Roy Littlejohn, his wife and daughter, and another corporation which he controlled.[1] On May 6, 1998, at the end of a non-jury trial, the trial judge announced in open court that the corporate veil was to be pierced and found each defendant—the two corporations, Roy Littlejohn, his wife Marilyn, and their daughter Robin—jointly and severally liable for $1,447,651.99 in damages.

Instead of immediately entering judgment, the judge asked each party to draft written findings of fact and conclusions of law consistent with his oral ruling. On May 20, 1998, the judge issued his written findings and signed the judgment. However, on May 8, only two days after the Littlejohns heard that they would be held personally liable for over $1.4 million (but before the judgment was entered), they conveyed all of their personal property to appellant, a longtime friend and associate with whom Roy Littlejohn had had a friendship and business relationship spanning fifteen years.[2] Roy Littlejohn and appellant prepared a Bill of Sale and a Lease Agreement to document the transaction. According to the Bill of Sale, appellant paid $16,640 for all personal property contained in the Littlejohns' residence, $3,400 for their jointly owned 1988 Volvo, and $6,500 for Roy Littlejohn's individually owned 1991 Jaguar—a total of $26,500.

Appellant never took actual possession of this property, but immediately "leased" it back to the Littlejohns. Under the Lease Agreement, appellant was to receive $500 per month for the Littlejohns' use of the cars, and $500 per month for their use of the household property. Roy Littlejohn cashed appellant's $26,500 check, and then immediately gave her $10,000 for what he later described as a ten-month "pre-payment" on the lease. Thereafter, however, Littlejohn never made another payment to

1. The facts of that case are summarized in our prior decision in *Lawlor v. District of Columbia*, 758 A.2d 964 (D.C.2000). Essentially, the employees claimed that they received no compensation for work performed between October 25 and November 18, 1995, and that the costs of certain benefits, which they did not receive, were nevertheless deducted from their paychecks. On appeal, we affirmed the judgment as to Roy Littlejohn and his daughter Robin, but reversed the judgment against Marilyn Littlejohn. *Id.* at 978.

2. Before working for Littlejohn at Urban Shelters, appellant was the General Manager of Haas Hardware, another corporation controlled by Littlejohn. Appellant described him as an "employer, friend, mentor, [and] surrogate father-type figure."

appellant, nor did she attempt to enforce the lease once the payments stopped.

On August 21, 1998, a Deputy United States Marshal arrived at the Littlejohns' home to execute a writ of attachment on their personal property to enforce the court's judgment. Roy Littlejohn greeted the marshal with the aforementioned documents and informed him that he was no longer the owner of the property. A few days later, on August 26, the employees filed a second suit (the instant case) against the Littlejohns and appellant, alleging that the purported sale of the Littlejohns' property to appellant was a fraudulent conveyance made with the "intent to hinder, delay, and defraud the plaintiff/creditors," in violation of D.C.Code §§ 28–3104(a) and 28–3105 (1996), and that the defendants had engaged in a conspiracy to violate these statutes. The employees asked the court to invalidate the sale and sought the value of the transferred assets in actual damages and $1.4 million in punitive damages.[3]

On March 6, 2001, almost three years after the second suit was filed, the case went to trial before a different judge. The crux of appellant and Littlejohn's defense was that the property had been transferred to appellant as collateral for a series of loans appellant made to Roy Littlejohn throughout 1998.[4] When questioned about the peculiar nature of this transaction, appellant testified that she had never seen a bill of sale or a lease, nor did she know how a lease worked despite her substantial education and business experience.[5]

After a three-day non-jury trial, the court found appellant and Roy Littlejohn liable on all three counts of the complaint, but also found that "the evidence was not sufficient to show that Mrs. Littlejohn was involved in the fraudulent transfer .…" The court explicitly rejected appellant's testimony, finding it to be "patently incredible." It further found that "the papers drawn up by the parties were entirely bogus, and that anyone with Ms. Chatman's background and sophistication knew it." The court was therefore satisfied that "the plaintiffs have demonstrated by the preponderance of the evidence that the two were engaged in a civil conspiracy to defraud."[6]

3. On August 28, 1998, soon after the failed attempt to execute the writ, a preliminary injunction was granted which required appellant to pay into the court registry any money received from the agreement. The only money ever paid into the registry, however, was the $10,000 "pre-payment" given to appellant by Mr. Littlejohn in May 1998.

4. According to appellant, Littlejohn asked for a $100,000 loan in February 1998 for a "business opportunity," but she agreed to provide only $50,000. She also testified that on May 8, 1998, the date of the transfer, Littlejohn asked for yet another loan, which she assumed was related to the same business opportunity. Pursuant to this May 8 "loan," Littlejohn suggested that he and his wife sell their home furnishings and automobiles to her as collateral for the loan. Appellant also claimed that after this May 8 "loan" she made two more such loans to Littlejohn—one of $10,000 and one of $25,000—and that she

never asked the reason for any of these loans, nor sought any collateral.

5. Appellant, who has two degrees in business-related disciplines, performed sales work for IBM before joining Urban Shelters and negotiated government contracts while at Urban Shelters.

6. The trial court also found the personal property of the Littlejohns to be owned as tenants by the entirety. Because Marilyn Littlejohn was not a party to the fraudulent transfer, the court's ruling was "with respect to the Jaguar only in that it involved only Mr. Littlejohn's name." Accordingly, the employees' recovery of actual damages was limited to $6,500 for the value of the Jaguar, $2,500 of the original $10,000 "pre-payment" deposited in the court registry (representing ten months of lease payments on the Jaguar), and court costs and attorney fees in the amount of $8,940.74, for a total of $17,940.74 in compensatory damages.

The court also found appellant and Littlejohn jointly and severally liable for $1.4 million in punitive damages, ruling that there was "clear and convincing evidence that Mr. Littlejohn and Ms. Chatman acted with evil motive, actual malice and with willful disregard for the rights of the plaintiffs." The court characterized their behavior as "outrageous and grossly fraudulent," especially considering the disparity in wealth between appellant and Littlejohn and the "people whom they scammed." The court also described the transaction as a "deliberate scheme to get around a lawful judgment," and stated that in its opinion "each defendant needs to be punished for their conduct [and] each defendant needs to serve as an example to prevent others from acting in a similar way."

Following the trial, appellant filed a "motion to remit or, in the alternative, set aside the punitive damage award," citing Superior Court Civil Rules 59(a), 59(e), and 60(b). The court denied that motion after a hearing, and appellant noted the instant appeal, contesting both the award of punitive damages and the amount awarded.[7]

## II

Appellant makes a twofold challenge to the sufficiency of the evidence supporting the award of punitive damages. First, she argues that there was no clear and convincing evidence of malice because she did not have specific knowledge about the

---

7. The employees also noted a cross-appeal. Their brief mentions nothing about the cross-appeal, however, and at oral argument counsel for the employees informed us that he was not pursuing it. We therefore dismiss the cross-appeal as abandoned. *See In re K.M.T.,* 795 A.2d 688, 691 (D.C.2002).

   The record does not disclose whether Mr. Littlejohn noted an appeal.

8. At one time it was thought that fraud alone could serve as a basis for punitive damages.

judgment against Littlejohn when she entered into the allegedly fraudulent transaction. Second, she argues that the employees did not adequately establish her net worth. We reject appellant's argument that there was no clear and convincing evidence of malice, but we agree that there was insufficient evidence of her net worth to sustain the punitive damages award.

### A. Malice

■ ■ Punitive damages may be awarded "only if it is shown by clear and convincing evidence that the tort committed by the defendant was aggravated by egregious conduct and a state of mind that justifies punitive damages." *Jonathan Woodner Co. v. Breeden,* 665 A.2d 929, 938 (D.C.1995), *cert. denied,* 519 U.S. 1148, 117 S.Ct. 1080, 137 L.Ed.2d 215 (1997). The requisite state of mind has been described by this court on numerous occasions. *See, e.g., Vassiliades v. Garfinckel's, Brooks Brothers, Miller & Rhoades, Inc.,* 492 A.2d 580, 593 (D.C.1985) ("outrageous conduct which is malicious, wanton, reckless, or in willful disregard for another's rights" (citations omitted)). When dealing specifically with cases in which the underlying tort is fraud, we have required, for punitive damages, that the tort be accompanied by "outrageous conduct such as maliciousness, wantonness, gross fraud, recklessness and willful disregard of another's rights." *Riggs Nat'l Bank v. Price,* 359 A.2d 25, 28 (D.C.1976).[8]

---

*See, e.g., Harris v. Wagshal,* 343 A.2d 283, 288 (D.C.1975) ("Proof of fraud or deceit is itself sufficient to support an award of exemplary damages, since fraud necessarily encompasses malice" (citation omitted)). "Our more recent cases on the subject make clear, however, that evidence over and above what is required to establish the underlying tort is necessary for punitive damages." *Railan v. Katyal,* 766 A.2d 998, 1012 (D.C.2001) (citations omitted); *accord, Boynton v. Lopez,* 473

The record in this case supports the trial court's finding, by clear and convincing evidence, that appellant's conduct was outrageous, grossly fraudulent, and in willful disregard of the employees' rights. We cannot overlook the massive scale of the fraud, which was designed to defraud not just one, but 297 persons. Another factor making appellant's actions particularly egregious and oppressive was the enormous disparity of wealth between appellant and the employees. While her exact net worth may be a matter of debate, as we shall discuss later in this opinion, she is indeed a very wealthy woman.[9] As for the employees, the trial court described their situation by stating, "based on the type of employment that [they] had ... people in that economic situation ... literally suffer when they don't get a paycheck." Yet, despite the employees' precarious financial situation, which was attributable in large part to Mr. Littlejohn and the collapse of Urban Shelters (as the first lawsuit showed), appellant willingly engaged in a fraudulent transaction with Mr. Littlejohn that prolonged their financial distress by forcing them to endure yet another lawsuit in order to receive their due compensation.

■ Although appellant does not challenge the court's finding that she knowingly and willingly participated in a fraud, she does argue that a finding of malice cannot stand because she did not have actual knowledge of the judgment against the Littlejohns when she entered into the fraudulent transaction. According to her logic, in order for punitive damages to be awarded, it is not enough that she willingly committed fraud; in addition, she claims, she had to know exactly who was being defrauded. This somewhat novel argument overlooks the trial court's factual finding—which was not plainly wrong or lacking in evidentiary support—that appellant was indeed aware that she was defrauding the employees.

The trial court heard testimony from two employees that in 1995, around the time Littlejohn's company was having financial difficulties, appellant spoke at an employee meeting where she reassured several of the employees that they would be receiving the money owed to them.[10] Additionally, there was evidence about the suspicious terms and timing of the conveyance, made to a person with whom appellant admitted having a long-standing business relationship and close personal friendship. While none of this evidence proves directly that appellant had specific knowledge of the judge's verdict in the first trial or that she knew exactly whom the scheme was designed to defraud, it certainly supports an inference that appellant knew the full details of the scheme. *See Jemison v. National Baptist Convention, USA, Inc.,* 720 A.2d 275, 285–286 (D.C.1998) ("The finder of fact can infer the requisite state of mind from the surrounding circumstances"); *Robinson v.*

---

A.2d 375, 377–378 (D.C.1984) (evidence insufficient to support an award of punitive damages, even though there was intentional misrepresentation, when the record was "devoid of evidence" showing willful or outrageous conduct or gross fraud).

9. Appellant testified that she owned her own home plus two automobiles (a Jaguar and a Mercedes–Benz); that she was building a $700,000 home in Fredericksburg, Virginia, at the time of the fraudulent conveyance; that she owned stocks and bonds (though she claimed she did not know their value); and that she received $12,000 per month from a marital trust, plus an additional $2,500 per month from an unnamed corporation under a "deferred payment plan."

10. The court specifically credited the employees' testimony and disbelieved that of appellant. That credibility finding is entitled to special deference. *See Auxier v. Kraisel,* 466 A.2d 416, 418 (D.C.1983).

*Sarisky,* 535 A.2d 901, 906 (D.C.1988) (malice "need not (and usually cannot) be proven by direct evidence, but may be inferred from all the facts and circumstances of the case" (citations omitted)).[11]

Furthermore, appellant overlooks the fact that the punitive damages were awarded not only because of her outrageous conduct towards the employees, but also because a fraud was perpetrated upon the court. By assisting Littlejohn in his efforts to frustrate a lawful judgment and make it unenforceable, appellant knowingly took part in a scheme which, as the trial court put it, "went to the very heart of the integrity of the civil justice system." An award of punitive damages may be based on such grounds. *Cf. Jemison,* 720 A.2d at 286 ("Appellants engaged in a collusive scheme characterized from the outset by fraud and deception, subverting the judicial process itself").

We therefore conclude that there was no factual or legal error in the trial court's finding of malice.

### B. *Net Worth*

■ The twofold purpose of punitive damages is "to punish unlawful conduct and to deter its repetition." *Daka, Inc. v. Breiner,* 711 A.2d 86, 98 (D.C.1998) (citations omitted); *see Cooper Industries, Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 432, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001) (punitive damages "operate as 'private fines' intended to punish" and are "an expression of ... moral condemnation" (citations and internal punctuation omitted)). However, "a plaintiff seeking to recover punitive damages based upon the wealth of the defendant ... *must* establish the de-

fendant's net worth at the time of trial." *Jonathan Woodner Co.,* 665 A.2d at 940 (emphasis added); *see Snow v. Capitol Terrace, Inc.,* 602 A.2d 121, 127 n. 8 (1992) (claim for punitive damages not allowed to go to the jury because ·the trial judge found insufficient evidence of the defendant's net worth). Courts place this burden on the plaintiff because "the amount of such damages should be enough to inflict punishment, while not so great as to exceed the boundaries of punishment and lead to bankruptcy." *Daka, Inc.,* 711 A.2d at 101 (citations omitted); *accord, Fraidin v. Weitzman,* 93 Md.App. 168, 212, 611 A.2d 1046, 1068 (1992) ("A defendant need not be financially destroyed in order to be punished").

■ Although the finding of malice is amply supported by the record, we cannot say the same about appellant's net worth. At trial, the employees' attempt to establish that appellant's net worth was between five and ten million dollars was limited to the following exchange:

> MR. ZUKERBERG [employees' counsel]: Now, you have been fortunate financially and have amassed a fairly large sum of money at this time; isn't that true?
>
> MS. CHATMAN: I inherited part of my husband's estate.
>
> MR. ZUKERBERG: And as I understand, you have a net worth between five and ten million dollars; is that fair to say?
>
> MS. CHATMAN: I don't know what it is, and you went out and met with my

---

11. Even if appellant did not know about the May 6 verdict at the time of the transaction on May 8, she surely learned of it (and the ensuing judgment) a few months later when the court entered an injunction that required her to deposit all proceeds from the lease agreement into the court registry. Despite this knowledge, she took no steps to renounce the transaction or rectify the situation in any way.

accountant. And I thought my financial records were supposed to be sealed.[12]

\* \* \* \* \* \*

MR. ELLIS [appellant's counsel]: Your Honor, because of the way the estate is tied up, I'm not sure my client can testify. I'm not sure anybody knows right now.

THE COURT: Okay.

MR. ZUKERBERG: Well, let me ask you this. Do you disagree with your accountant's statement that you have a net worth between five and ten million dollars?

MS. CHATMAN: I don't disagree.

MR. ZUKERBERG: And your husband's estate was in excess of ten million dollars when he passed?

MS. CHATMAN: I believe that's correct.

\* \* \* \* \* \*

MR. ZUKERBERG: Now, I understand, once your husband's estate is finishing probating, you will get an additional amount of money; is that your anticipation?

MS. CHATMAN: No.

Thus the only "evidence" concerning appellant's net worth adduced at trial was contained within counsel's question. It is axiomatic, however, that questions asked by counsel cannot be regarded as evidence. *See, e.g., Arnold v. United States,* 511 A.2d 399, 412 (D.C.1986); *cf. Dumas v. Stocker,* 213 Cal.App.3d 1262, 1268, 262 Cal. Rptr. 311, 315 (1989) ("Plaintiff made no effort to introduce evidence of defendant's wealth, and instead relied on innuendo and improper argument to garner the award" (footnote omitted)). But even if we were to consider counsel's question as evidence, it would still be insufficient to establish appellant's net worth. The parties clearly did not stipulate to that amount, and we reject the employees' argument that appellant admitted having a net worth of five to ten million dollars by merely replying "I don't disagree" to counsel's question. When viewed in context, failing to "disagree" with the comment about her net worth cannot substitute for an affirmation. Indeed, one can neither agree nor disagree with a stated figure if the exact sum at issue is unknown.

■ Consequently, while the evidence of appellant's wealth sporadically presented throughout the trial (see note 9, *supra*) was sufficient to show that appellant had some ability to pay, "the damages awarded were far in excess of any proof of current net worth." *Jonathan Woodner Co.,* 665 A.2d at 942 (footnote omitted). Thus we cannot be assured that appellant could absorb a $1.4 million award without facing financial ruin. Under the circumstances of this case, the employees at a minimum should have called appellant's accountant to testify, with accompanying documentary evidence, unless of course appellant was willing to stipulate to an amount.[13] *Cf.*

---

12. Because appellant refused to comply with all discovery requests, the employees' counsel arranged to meet with appellant's accountant. At the post-trial hearing, counsel explained, "When the five to ten million dollar figure was provided, we did not go forward with our motion to compel because we knew that our suit was for 1.4 million dollars and that was sufficient, and we dropped it at that." Appellant's counsel confirmed that this meeting occurred, but never stipulated to the "five to ten million dollar figure."

13. While some courts have concluded that under certain circumstances it is the defendant who has the burden of establishing net worth, *see, e.g., Hutchinson v. Stuckey,* 293 U.S.App. D.C. 224, 228 n. 4, 952 F.2d 1418, 1422 n. 4 (1992), this court has made clear that the plaintiff carries the burden in situations such as the one before us, in which a claim for punitive damages is based in part

*Barragan v. Banco BCH,* 188 Cal.App.3d 283, 302, 232 Cal.Rptr. 758, 769 (1986) (holding that there was insufficient evidence of net worth, in part because no documentary evidence was admitted to clarify a witness' confusing testimony on that issue). We therefore must remand this case to the trial court for a *de novo* determination of appellant's net worth and the entry of an appropriate judgment thereafter. *See Jonathan Woodner Co.,* 665 A.2d at 940.

## III

Citing Civil Rules 59 and 60(b), appellant filed a post-trial motion to set aside the punitive damages award, or in the alternative for remittitur, on the ground that the award was "against the weight of the evidence" and was "shockingly excessive." In her motion appellant made essentially the same arguments that she now makes on appeal. At the hearing on the motion, however, she sought to present testimony from her accountant and the vice president of the bank that manages some of her assets to establish that her net worth was just over $1.4 million, rather than somewhere between $5 million and $10 million as suggested at trial. The

court refused to allow this testimony to be heard because it had been available at trial and could have been presented then. Appellant now challenges that refusal, arguing that the court abused its discretion by "disregard[ing] compelling evidence that the punitive damages award was based on false information that greatly overstated Mrs. Chatman's net worth."

■■ Appellant's failure to make this argument below precludes her from doing so on appeal. *See, e.g., District of Columbia v. Gray,* 452 A.2d 962, 964 (D.C.1982) ("matters not raised at the trial court level may not be raised for first time on appeal" (citations omitted)). At the hearing on the motion, the only argument that appellant offered in favor of admitting the testimony was that it constituted newly discovered evidence, which placed her argument squarely under Rule 60(b)(2).[14] On appeal, however, she cites only Rule 60(b)(6) as a basis for reversing the trial court's decision, and we have made clear that arguments under each component of Rule 60(b) are separate and not interchangeable. *See Partnership Placements, Inc. v. Landmark Insurance Co.,* 722 A.2d 837, 844 (D.C.1998) (holding that a Rule 60(b)(6) motion cannot "include any of the grounds

on the wealth of the defendant. *See Jonathan Woodner Co.,* 665 A.2d at 941 n. 19. We have yet to decide which party has the burden in a case—unlike this one—in which punitive damages are sought but not on the basis of the defendant's wealth. *See Jonathan Woodner Co. v. Breeden,* 681 A.2d 1097, 1098 (D.C. 1996) (amending footnote 19 of the original *Jonathan Woodner Co.* opinion by adding the following sentence: "We do not reach any issues relating to proof of net worth where the plaintiff is not seeking an award of punitive damages based upon the wealth of the defendant, as the plaintiff did here" (citation omitted)).

14. Rule 60(b)(2) provides that "the Court may relieve a party ... from final judgment" if there is "newly discovered evidence which by

due diligence could not have been discovered in time to move for a new trial under Rule 59(b)." Because the proffered testimony of appellant's accountant and banker was readily available to her before trial and could have been presented at trial, it was not "newly discovered evidence" as that term is used in Rule 60(b)(2). *See, e.g., American Continental Insurance Co. v. Pooya,* 666 A.2d 1193, 1199 (D.C.1995). Thus the trial court did not abuse its discretion, *see Starling v. Jephunneh Lawrence & Associates,* 495 A.2d 1157, 1159 (D.C.1985), by refusing to allow such testimony to be presented before it ruled on the motion. Appellant has now taken a new approach on appeal by couching her argument in terms of Rule 60(b)(6), but as we shall see, Rule 60(b)(6) is of no help either.

for relief provided elsewhere in Rule 60(b)" (citations omitted)).

■ Even if appellant's argument were properly before this court, it would fail. Appellant chiefly relies on *Good Luck Nursing Home, Inc. v. Harris,* 204 U.S.App. D.C. 300, 636 F.2d 572 (1980), in which the court stated:

> When a party timely presents a previously undisclosed fact so central to the litigation that it shows the initial judgment to have been manifestly unjust, reconsideration under Rule 60(b)(6) is proper even though the original failure to present that information was inexcusable.

*Id.* at 305, 636 F.2d at 577 (citations omitted).[15] Appellant fails to point out, however, that the court in *Good Luck* also said that "Rule 60(b) cannot ... be employed simply to rescue a litigant from strategic choices that later turn out to be improvident." *Id.* (citations omitted); *accord, District No. 1—Pacific Coast District v. Travelers Casualty & Surety Co.,* 782 A.2d 269, 278 (D.C.2001) (Rule 60(b) is not "designed 'to enable a party to complete presenting [its] case after the court has ruled against [it]' " (citation omitted)). Because appellant elected to withhold this information about her financial status during the

trial, the court was under no obligation to allow the testimony which she proffered at the post-trial hearing. ·

### IV

■ Finally, appellant argues that the punitive damages award is so excessive that it violates her right to due process under the Fifth Amendment. The reasonableness of a punitive damages award is determined by three "guideposts": (1) the reprehensibility of the defendant's conduct; (2) the difference between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages and any potential civil or criminal penalties. *See BMW of North America, Inc. v. Gore,* 517 U.S. 559, 574, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).[16]

■ We recently were faced with a similar argument that a punitive damages award was so excessive as to violate due process. In *Daka, Inc. v. Breiner,* while analyzing the second of the Supreme Court's three guideposts, we considered the fact that the punitive damages award amounted to less than 2.5% of the defendant's income from the sites at which the plaintiff suffered workplace harassment.

---

**15.** Appellant also cites *Miranda v. Contreras,* 754 A.2d 277 (D.C.2000), *Hawkins v. Lynnhill Condominium Unit Owners Ass'n,* 513 A.2d 242 (D.C.1986), and *Starling v. Jephunneh Lawrence & Associates, supra* note 14, in each of which we held that the trial court abused its discretion by failing to inquire into certain factual issues before denying a Rule 60(b) motion. *See also Chappelle v. Alaska Seaboard Partners, L.P.,* 818 A.2d 972, 974 (D.C. 2003) (citing *Hawkins* ). These cases, however, all dealt with default judgments, unlike the case at bar, in which there was a trial on the merits at which appellant had the opportunity to offer, but did not offer, the testimony she sought to present for the first time at the post-trial hearing.

**16.** Appellant's argument focuses mainly on the ratio of actual damages to potential damages. We have held, however, that "any constitutional limitation on the award of punitive damages relates not only to actual damages, but to the injury that *could* have flowed from the conduct." *Ayala v. Washington,* 679 A.2d 1057, 1070 (D.C.1996) (emphasis in original) (citing *TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 465, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993)). We have also "consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual *and potential* damages to the punitive award." *Ayala,* 679 A.2d at 1070 (emphasis in original; citation omitted).

*See Daka,* 711 A.2d at 101. In doing so, we necessarily included in our analysis the defendant's ability to pay. We are unable to do that in this case. Because appellant's net worth was not sufficiently established at trial (for reasons already explained), we are not in a position to decide whether the award runs afoul of the Due Process Clause, and thus we refrain from addressing the issue here.

## V

In No. 01–CV–854, we affirm the finding of liability, based on sufficient evidence of malice, and we sustain the court's decision to award punitive damages in some amount. We also affirm the denial of the post-trial motion. We vacate the final judgment and remand the case for further proceedings to determine appellant's net worth; after that is done, the court may enter such judgment as may be appropriate. We dismiss the employees' cross-appeal (No. 01–CV–861); see note 7, *supra.*

*It is so ordered.*