Filed 1/16/26  Vickers Holding & Finance v. Magic Touch Repair CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| VICKERS HOLDING & FINANCE, INC., | B338412 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. 21STCV22975 |
| v. | |
| MAGIC TOUCH REPAIR, INC., et al., | |
| Defendants and Appellants. | |

APPEALS from a judgment and postjudgment orders of the Superior Court of Los Angeles County, Bruce G. Iwasaki, Judge. Affirmed in part and vacated in part with directions.

Krause-Leemon Cohen & Daneshrad and David R. Krause-Leemon for Defendants and Appellants.

Loeb & Loeb and Oleg (Alex) Stolyar for Plaintiff and Respondent.

———————————

Dmitry Sklyar and his company Magic Touch Repair, Inc. (Magic) (collectively, defendants) appeal from the court's denial of their motion under Code of Civil Procedure[1] section 473, subdivision (d) (473(d)) to set aside a $10 million default judgment entered in favor of plaintiff Vickers Holding & Finance, Inc. (Vickers).  They contend the judgment is void for improper service and for exceeding the amount pleaded in the complaint. Defendants also appeal from an amendment to the judgment that added an express $400,000 award against Magic contending the amendment did not correct a "clerical error."[2]  We conclude the court did not err in finding defendants had been properly served, and the default judgment was proper.  We conclude the court erred, however, in amending the judgment.  We therefore vacate the amended judgment and direct the court to reinstate the original default judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

This action arose from Vickers' attempt to collect on a Dutch judgment—in the amount of $6,573,414 plus contractual interest—entered against Jossiv Kim after he fraudulently induced Vickers to enter into a loan agreement that Jossiv then breached.  During the pendency of that litigation, Jossiv and his wife Angelina Kim fled to California.  In 2017, Vickers filed an action in the Los Angeles Superior Court (case no. BC674584) to enforce the Dutch judgment, and for fraudulent

---

[1]     Statutory references are to the Code of Civil Procedure unless otherwise stated.

[2]     As we conclude the court amended the judgment in error, we need not consider defendants' other contentions.

2

transfers and civil conspiracy, against Jossiv, Angelina, and their shell company. On November 6, 2018, the court entered a judgment enforcing the Dutch judgment in the amount of $6,597,215, plus $2,297,416 in interest, with additional interest of $717.00 accruing on a daily basis, jointly and severally against the Kims and their defunct shell company. The complaint refers to this judgment as "the CA Judgment."

The Kims evaded Vickers' attempts to collect the CA Judgment. As Vickers alleged, the Kims engaged in a scheme of fraudulent transfers "designed to hide" the monies they had "misappropriated." In 2017, Jossiv began annually transferring "hundreds of thousands of dollars" to third-party entities, including Magic. Jossiv then had Magic, and the other entities, transfer the funds—minus a percentage—back to him "as purported compensation" for his "fictitious work as an appliance repair technician." Sklyar handled the transfers on behalf of Magic, and Jossiv compensated him for his participation in the scheme.

In March 2020, Vickers obtained a court order assigning to Vickers "[a]ny and all monies now due, or to become due in the future, to Judgment Debtors"[3] from Magic and other identified entities. After the assignment order was entered, Jossiv had Magic, and the other entities, transfer the funds Jossiv sent them to ABCCOMFORT LLC (ABC)—a company newly formed in the name of the Kims' 18-year-old son Alex Anton Kim (Anton) —instead of back to himself. Starting around April 2020, ABC received tens of thousands of dollars from Magic and other

[3] "Judgment Debtors" means the Kims.

3

entities. Anton transferred those funds to his personal account and then to the Kims.

On June 21, 2021, Vickers filed the current action against ABC, Anton, Magic, and Sklyar to obtain a judgment (1) voiding fraudulent transfers the Kims made to defendants, and (2) declaring defendants co-conspirators and/or alter egos of the Kims and therefore jointly and severally liable on the CA Judgment. The complaint alleged causes of action against both Sklyar and Magic for fraudulent transfer under Civil Code section 3439.04 and for unjust enrichment, and against Sklyar for civil conspiracy.

The fraudulent transfer claim alleged Magic received "at least [$400,000] in Stolen Funds [meaning the monies the Kims owed Vickers] from Judgment Debtors." Magic, through Sklyar, "then transferred at least $350,000 back to Jossiv" as purported payments for "fictitious work" he performed for Magic. Sklyar, "using Magic," also "transferred at least an additional $20,000 in Stolen Funds" that he received from the Kims to bank accounts in ABC's name. The complaint alleged the transfers "were fraudulent transfers, entitling [Vickers] to a judgment setting such transfers aside and declaring them void, and awarding recovery of as much of the proceeds or value thereof from Sklyar and Magic . . ., as the transferees, in an amount necessary to satisfy the debt owed to [Vickers]."

The civil conspiracy claim alleged Vickers had been damaged "in an amount that will be determined at trial but not less than $1,500,000" due to Sklyar and Anton having "willfully conspired with the Judgment Debtors to defraud [Vickers] in the collection of the amounts owed to [Vickers] by the Judgment Debtors pursuant to the CA Judgment."

4

The allegations in the body of the complaint were incorporated by reference in each cause of action.

The complaint's prayer for relief asked the court "[f]or a judgment declaring that all Fraudulent Transfers by the Judgment Debtors to Sklyar and Magic . . ., and from Magic . . . to Jossiv, ABC, and Anton, as referenced in paragraph 94 of the Complaint[,] are voidable transfers within the meaning of Cal. Civ. Code § 3439.04, and avoiding these transfers to the extent necessary to satisfy the amounts awarded to [Vickers] in the CA Judgment"; and "[f]or an order finding Sklyar jointly and severally liable for the unpaid amount of the CA Judgment as a co-conspirator of Judgment Debtors and Anton."

Vickers filed proofs of service showing that, on July 7, 2021, its registered process server Paul Katz served the summons and complaint on Sklyar and Magic by substituted service under section 415.20 at 2222 Foothill Blvd., Suite 110—Mail Boxes L.C. —in La Canada Flintridge (the 2222 address). On Sklyar's proof of service, Katz checked item 3.b., indicating "Brian Choi of Mail Boxes L.C. for Dmitry Sklyar" was the "[p]erson (other than the party . . .) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made)." Katz also checked box 5.b. to indicate he had served Sklyar "by substituted service" by leaving a copy of the summons and complaint at the 2222 address with "Brian Choi of Mail Boxes L.C. Pursuant to C.C.P. 415.20(a)." Katz checked box 5.b.(1), indicating Choi was "a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served" and that Katz had "informed him or her of the general nature of the papers." He "thereafter mailed . . . copies of the documents to the person to be served at the place

5

where the copies were left (Code Civ. Proc., § 415.20)." In his attached declaration of diligence, Katz attested he attempted personal service of Sklyar at a residence—2115 La Canada Crest, Apt. 211 in La Canada Flintridge (the La Canada address)—on July 6, 2021 at 6:15 p.m., July 6, 2021 at 8:45 p.m., and July 7, 2021 at 11:15 a.m. No one was home. The proof of service for Magic was the same, except that Katz typed "Brian Choi of Mail Boxes L.C. for Dimitry [*sic*] Sklyar, agent of service & CEO of Magic Touch Repair" under item 3.b.

Neither Magic nor Sklyar responded to the complaint. On August 26, 2021, Vickers filed separate requests for entry of default against Sklyar and Magic, which the clerk entered the same day. Vickers' attorney served the requests for entry of default by mail at the 2222 address to "Brian Choi of Mail Boxes L.C. for Dmitry Sklyar," individually and as Magic's CEO and agent for service of process.

Meanwhile, in the CA Judgment enforcement proceedings, Vickers' lawyer filed a declaration stating that, at a December 3, 2021 contempt hearing,[4] "it was shown" that the address for Magic's listed agent for service of process—" 'Dmitry Dmitry' "—at " '13423 Vanowen Street Suite 4, North Hollywood' " was "nonexistent." A background check revealed Sklyar's correct home address was "13243 Vanowen Street Apt 4[,] North Hollywood," where he owned a condominium. On October 28, 2021, "[a]fter multiple attempts to evade service," Sklyar was personally served at the 13243 Vanowen Street address (the

---

[4] Sklyar had been evading service of subpoenas to appear for hearings and examination and to produce financial records.

North Hollywood address) with a subpoena requiring him to appear at the contempt hearing.  On that same day, Vickers had the same individual personally serve Sklyar—individually and on behalf of Magic—at the North Hollywood address with the summons and complaint in the current action.[5]

On September 21, 2022, Vickers filed a request for default judgment against Magic and Sklyar for $9,904,969.  Katz submitted a declaration dated September 20, 2022, with further details on his service.  He declared he could not find Magic's agent for service of process—Sklyar—"at any physical address."  "[I]n lieu of" personally delivering a copy of the summons and complaint "for Magic . . . to . . . Sklyar (as its agent for service of process)," he served Magic "pursuant to . . . section 415.20(a), by leaving a copy of the summons and complaint during usual office hours at Magic['s] . . . usual mailing address, [the 2222 address] (a private mailbox), with the person who was in charge thereof (Brian Choi)."  "I then mailed a copy of the summons and complaint . . . to the person to be served at the place where a copy of the summons and complaint were left."  Katz declared he did the same for Sklyar, except "pursuant to . . . section 415.20(b)," after he was unable to serve him personally.  Before serving "the documents on . . . Choi, as the person in charge of the private mail box" for Magic and Sklyar, Katz confirmed with him that both Sklyar and Magic "received their mail at that location."  Katz attached a copy of Magic's licensing details from the California Household Goods and Services Bureau showing Sklyar

[5]     The proofs of service weren't filed at that time.  They were exhibits to Vickers' attorney's declaration filed in support of Vickers' opposition to defendants' 473(d) motion.

7

was Magic's owner and manager and listing Magic's address as the 2222 address, and a copy of a January 3, 2021 check Magic issued to Jossiv bearing the 2222 address.

Vickers served Sklyar and Magic with the request and supporting papers by mail at the North Hollywood and 2222 addresses. The trial court set an Order to Show Cause Re: Entry of Default Judgment for March 15, 2023. Vickers served Sklyar and Magic with notice of the OSC by mail at the same addresses.

At the March 15 hearing, the trial court granted Vickers' request for entry of default judgment. On March 20, the court entered a default judgment against Sklyar and Magic. The judgment (1) voided all fraudulent transfers by the Kims to Sklyar and Magic, and from Magic to the Kims, "as referenced in paragraph 94 of the Complaint," "to the extent necessary to satisfy the amounts awarded" to Vickers in the CA Judgment; and (2) adjudged Sklyar, as a co-conspirator of the Kims, jointly and severally liable for the amount of the CA Judgment: $8,894,631, plus $1,139,313 in accrued interest as of March 15, 2023 (calculated at $717 per day from November 6, 2018—the date of entry of the CA Judgment—through March 15, 2023), minus $3,500 Vickers already had collected, for a total of $10,030,444.

On March 27, 2023, Sklyar and Magic were served by mail at the North Hollywood and 2222 addresses with notice of the entry of judgment. Almost a year later, on March 4, 2024, Sklyar and Magic filed a joint 473(d) motion to vacate the default judgment and defaults as void. Sklyar submitted a supporting declaration.

Sklyar declared he first learned about the default judgment on February 29 when he discovered his bank accounts were

8

frozen.[6]  He declared he had lived at "13243 Vanowen Street"—
the North Hollywood address—since 2007.  (Sklyar calls this
address the "Sklyar Residence.")  He also declared he lived at
the La Canada address for only one year before 2007.  Sklyar
declared the 2222 address was not his usual mailing address—
the North Hollywood address was—although he "maintained a
mailbox" there.  And, although Magic sometimes received mail
at the 2222 address, that address was not its principal business
address.  Nor was it the address for Magic's agent for service of
process (Sklyar)—the North Hollywood address was, since 2012.[7]
Sklyar declared, "I never received in the mail any summons
or complaint addressed to myself individually or as the agent
for service on behalf of Magic.  Nor did I receive anything from
'Brian Choi.' "

Vickers opposed the motion.  Katz submitted a second
declaration.  Katz declared that, before substitute serving
defendants at the 2222 address, he first attempted to serve
Sklyar at the North Hollywood address—an address "online

---

[6]  Chase Bank had placed a hold on two of Sklyar's/Magic's
accounts after a February 26 levy of a writ of execution Vickers
obtained.

[7]  Contrary to Sklyar's declaration that Magic's principal
business office had been the "Sklyar Residence" for seven years,
the relevant Statements of Information (SOIs) filed with the
Secretary of State—attached to his declaration—identify the
previously-discovered nonexistent address of "13423 Vanowen
Street" as Magic's and Sklyar's address.  That same address is
listed for Magic's agent for service of process—"Dmitry Dmitry"
and then Sklyar.

9

research at the time revealed to be one of several potential addresses" for Sklyar. Katz determined Sklyar no longer lived at that address "based on no one answering the door, the lack of any lights in the windows, and a conversation with a neighbor who advised me that he was not aware of anyone by the name of Dmitry Sklyar residing at that location." Katz then made the three attempts to serve Sklyar at the La Canada address— "another potential address" online research identified. Katz declared he included only those three service attempts in his due diligence declaration because they post-dated his attempts to serve Sklyar at the North Hollywood address. Katz understood "only the most recent three efforts to serve the defendant with summons need to be reflected on a process server's due diligence declaration." Katz then served Sklyar "under . . . section 415.20(b)," as set forth in his first declaration.

On April 10, 2024, the court heard and denied defendants' 473(d) motion. Sklyar and Magic filed a notice of appeal from the April 10 order denying their motion and from the default judgment (case no. B338412).

Meanwhile, in March 2024, Magic—through Sklyar— filed a third-party claim of ownership on the frozen Chase Bank accounts. After a hearing on August 13, 2024, the trial court denied Magic's claim, ruling Magic was a judgment debtor, not a third party, and Vickers had a " 'superior interest' " to the funds in the accounts "because Magic . . . owes Vickers $400,000" under the judgment, based on its order that all fraudulent transfers referenced in paragraph 94 of the complaint—which identified the $400,000 transfer from Jossiv to Magic—were void to the extent necessary to satisfy the 2018 judgment.

10

Two days later, Vickers attempted to file a writ of execution against Magic for $400,000.[8]  The clerk rejected it, as the judgment did "not specify an award of $400,000."  Accordingly, on August 22, 2024, Vickers filed an ex parte application for an order correcting the default judgment for "clerical error, to conform to the judgment directed by the Court, that Magic . . . is liable to Vickers for $400,000 in fraudulent transfers, pursuant to paragraph 1 of the 03/20/23 Judgment."  Defendants opposed the application, arguing the court lacked jurisdiction to alter the judgment, as defendants' appeal was pending, and the court had "made no 'clerical' error."

After a hearing on August 23, 2024, the trial court entered a minute order granting Vickers' application, having found "there was a clerical error."  The court signed and filed an amended judgment against Magic and Sklyar, as Vickers proposed.  The amended judgment added the following sentences to the end of paragraph 1 of the default judgment:  "Paragraph 94 of the Complaint expressly states that 'Magic . . . received at least $400,000 in Stolen Funds' in fraudulent transfers from Jossiv Kim.  Thus, defendant Magic . . . is jointly and severally liable in the amount of $400,000 to [Vickers]."  A paragraph 3 also was added, stating:  "For clarity, this Amended Judgment corrects a clerical error in the original March 20, 2023 Judgment.  Thus, post-judgment interest shall accrue from March 20, 2023."  Defendants filed a notice of appeal from the trial court's August 23, 2024 order granting Vickers' ex parte application

---

[8]    Chase Bank planned to release its hold on Magic's accounts unless it received a writ of execution against Magic by August 26.

11

and the resulting amended judgment (case no. B340608). We consolidated defendants' appeals for all purposes under case no. B338412.

## DISCUSSION

Defendants challenge the court's (1) denial of their 473(d) motion to vacate the March 20, 2023 default judgment and the underlying defaults as void for improper service and under section 580, and (2) the court's order granting Vickers' application to amend the default judgment and entry of the amended judgment to "correct[ ] a clerical error."

### 1.    *Motion to set aside default judgment*

"Section 473, subdivision (d) provides a trial court *may*, on motion of either party after notice to the other party, set aside any void judgment or order; inclusion of the word 'may' in the language of section 473, subdivision (d) makes it clear that a trial court retains discretion to grant or deny a motion to set aside a void judgment. [Citation.] However, the trial court has no statutory power under section 473, subdivision (d) to set aside a judgment that is not void. [Citation.] Thus, the reviewing court faces two separate determinations when considering an appeal founded on section 473, subdivision (d): whether the judgment is void and, if so, whether the trial court properly exercised its discretion in setting (or not setting) it aside. [Citation.] The trial court's determination whether a judgment is void is reviewed de novo; its decision whether or not to set aside a void order is reviewed for abuse of discretion." (*Kremerman v. White* (2021) 71 Cal.App.5th 358, 369.)

a.	*Service*

i.	Applicable law

" '[C]ompliance with the statutory procedures for service of process is essential to establish personal jurisdiction.  [Citation.]  Thus, a default judgment entered against a defendant who was not served with a summons in the manner prescribed by statute is void.  [Citation.]'  [Citation.]  Under section 473, subdivision (d), the court may set aside a default judgment which is valid on its face, but void, as a matter of law, due to improper service." (*Ellard v. Conway* (2001) 94 Cal.App.4th 540, 544 (*Ellard*).)

Our high court recently rejected the judicially-imposed, two year limitations period—borrowed from section 473.5— applied to 473(d) motions that rely on extrinsic evidence to show the default judgment is void for improper service.  (*California Capital Ins. Co. v. Hoehn* (2024) 17 Cal.5th 207, 215, 223–226 (*Hoehn*) [abrogating "the *Rogers* rule"—as stated in *Rogers v. Silverman* (1989) 216 Cal.App.3d 1114 and *Trackman v. Kenney* (2010) 187 Cal.App.4th 175—that a motion valid on its face, but void for improper service, is subject to a " 'two-year outer limit' for seeking relief" under § 473(d)].)

Under section 473.5, subdivision (a), a party may move to set aside a default or default judgment where "proper constructive service" of the summons was given but the defendant did not receive actual notice of the action in time to defend it.  (*Hoehn, supra*, 17 Cal.5th at pp. 212, 215.)  Such a motion must be made "within a reasonable time, but in no event exceeding the earlier of:  (i) two years after entry of a default judgment against the party; or (ii) 180 days after service on the party of a written notice that the default or default judgment has been entered."  (§ 473.5, subd. (a).)  Here, the trial court applied

13

the now-defunct *Rogers* rule to defendants' 473(d) motion—as it was based on extrinsic evidence—but found the motion timely under the two-year limitations period set forth in section 473.5.[9] Accordingly, the court's application of the *Rogers* rule was harmless.

Defendants contend the March 2023 default judgment was void for lack of proper service both on its face and based on the extrinsic evidence. "When, as here, the trial court considers disputed evidence related to whether service was proper, our review is for abuse of discretion. [Citation.] Under that standard, we defer to factual findings on disputed evidence so long as those findings are supported by substantial evidence." (*First American Title Ins. Co. v. Banerjee* (2022) 87 Cal.App.5th 37, 42 (*Banerjee*); see also *Fernandes v. Singh* (2017) 16 Cal.App.5th 932, 940 ["we defer to the trial court's resolution of any factual conflicts in the declarations"].)

ii.     The court did not err in finding service proper

Section 415.20, subdivision (a) states: "In lieu of personal delivery of a copy of the summons and complaint to the person to be served as specified in Section 416.10, 416.20, 416.30, 416.40,

_____

[9]     Vickers argues defendants' motion was untimely because it was filed more than 180 days after they were served with notice of entry of judgment. Under *Hoehn* that limitations period does not apply. Vickers also argues defendants' motion—because it was based on extrinsic evidence—had to be filed within the six-month limitations period prescribed by section 473, subdivision (b). That subdivision governs motions for relief from default based on "mistake, inadvertence, surprise, or excusable neglect." (§ 473, subd. (b).) Defendants moved to vacate the default judgment on the ground it was void under section 473(d).

14

or 416.50, a summons may be served by leaving a copy of the summons and complaint during usual office hours in the person's office or, if no physical address is known, at the person's usual mailing address, . . . with the person who is apparently in charge thereof, and by thereafter mailing a copy of the summons and complaint by . . . first-class mail, . . . with postage prepaid, to the person to be served at the place where a copy of the summons and complaint were left."

Section 415.20, subdivision (b)(1) similarly states, as relevant here: "If a copy of the summons and complaint cannot with reasonable diligence be personally delivered to the person to be served, as specified in Section 416.60, 416.70, 416.80, or 416.90, a summons may be served by leaving a copy of the summons and complaint at the . . . usual place of business, or usual mailing address . . ., in the presence of . . . a person apparently in charge of their office, place of business, or usual mailing address . . ., and by thereafter mailing a copy of the summons and of the complaint by . . . first-class mail, . . . with postage prepaid, to the person to be served at the place where a copy of the summons and complaint were left."

The proofs of service indicate Sklyar and Magic were validly served by substituted service under section 415.20. Katz made three attempts on two different days to personally serve Sklyar. After those attempts were unsuccessful, he: left a copy of the summons and complaint with Brian Choi of Mail Boxes L.C.—as the person "apparently in charge at the office or usual place of business of the person to be served"—for Dmitry Sklyar and for Dmitry Sklyar as the agent for service of process for, and CEO of, Magic; and mailed a copy of the documents "to the person to be served at the place where the copies were left."

15

Defendants contend the proofs of service are defective on their face.  The proof of service for Sklyar states substituted service was performed under " 'C.C.P., 415.20(a)' " when the proper procedure for effectuating substituted service for individuals is section 415.20, subdivision (b).  Although Katz made—in Vickers' words—a "scrivener's error," the proof of service itself shows he complied with subdivision (b).  The primary difference between the two subdivisions is that substituted service under subdivision (b) is available only if, after "reasonable diligence," a copy of the summons and complaint could not be delivered personally to the person to be served.  (§ 415.20, subd. (b); *Evartt v. Superior Court* (1979) 89 Cal.App.3d 795, 802 (*Evartt*) ["exercising reasonable diligence to effect personal service" is a "mandatory prerequisite to [substitute] service"].)  Katz's declaration of due diligence stated he made three unsuccessful attempts to serve Sklyar personally at the La Canada address.  The proof of service thus establishes Katz followed the procedure under subdivision (b).  In any event, Katz also later declared he had served Sklyar by substituted service under section 415.20, subdivision (b).

Defendants contend Katz's three attempts at personal service—made within an 18-hour period—cannot constitute reasonable diligence as a matter of law.  "[T]he burden is upon the plaintiff to show reasonable diligence to effect personal service and each case must be judged on its own facts.  'No single formula nor mode of search can be said to constitute due diligence in every case.' " (*Evartt, supra*, 89 Cal.App.3d at p. 801.)  Defendants rely on *Evartt,* where the court found—after considering extrinsic evidence—a process server's three attempts at personal service on two consecutive days (in the afternoon

16

and the following morning and night) did not constitute reasonable diligence, rendering the substituted service ineffective.  (*Id*. at pp. 797–798, 802.)  The plaintiff there, however, had made no effort to serve the defendant until three days before the expiration of the three-year limitations period, and defendant's house sitter had told the process server on his first attempt that defendant was on vacation—yet he returned to the address the very next day.  (*Id.* at p. 798.)  The court concluded the plaintiff's "11th-hour token efforts [couldn't] be considered independent of her unexplained neglect during the 2 years and 363 days as it would be incongruous to hold that neglectful conduct [could] constitute an excuse for not exercising reasonable diligence."  (*Id.* at p. 802.)

Here, there is no such evidence of dilatory negligence. Katz attempted to serve Sklyar at the La Canada address at two different times in the evening, and in the mid-morning on the next day.  We cannot say three attempts of personal service on two different days at three different times of day is per se unreasonable.  (See *Bein v. Brechtel-Jochim Group, Inc.* (1992) 6 Cal.App.4th 1387, 1391–1392 (*Bein*) [" ' "Ordinarily, . . . two or three attempts at personal service at a proper place should fully satisfy the requirement of reasonable diligence and allow substituted service to be made." ' "].)

The extrinsic evidence also supported the court's due diligence finding.  Katz declared he attempted to serve Sklyar personally at the North Hollywood address—where Sklyar declared he lived—but was under the impression he need not include those attempts in his due diligence affidavit.  Katz determined Sklyar no longer lived there based on a conversation with a neighbor who didn't know of anyone named Dmitry Sklyar

17

living in the building and other factors.  Katz then made the three unsuccessful attempts at service at the La Canada address —a potential address he discovered through online research.  The court found the evidence showed Vickers had met the reasonable diligence requirement.

Defendants argue Katz's "declaration disclosed only a single effort to serve Sklyar at the Sklyar Residence," which was insufficient to establish due diligence.  But the court implicitly found Katz's declaration credible—including his assessment that Sklyar no longer was living at the address.  (See *Ellard, supra*, 94 Cal.App.4th at pp. 543, 545 [explaining it would have been futile for process server to return to residence to attempt service when gate guard told him defendants had moved].)  We also reject defendants' contention that Vickers' attorney's declaration filed in the CA Judgment case established "Vickers was aware of Sklyar's actual address."  That Vickers later learned Sklyar could be served at the North Hollywood address does not diminish Katz's earlier determination in July 2021 that Sklyar was not there.  Vickers was not able to serve Sklyar at the North Hollywood address in the CA Judgment action until late October 2021.  It had the summons and complaint in this action served at the same time.  Accordingly, we find no error in the court's finding of due diligence.

Defendants claim the proofs of service show service was invalid on the additional ground that, because they name Brian Choi as the "[p]erson . . . served" under item 3.b., the statement that Katz mailed the documents "to the person to be served" at the 2222 address indicates he mailed the documents to Choi, not to Sklyar or to Sklyar as Magic's agent for service of process or CEO, as section 415.20 requires.  We disagree.

18

Katz checked both items 3.b. and 5.b. and "Brian Choi of Mail Boxes L.C." is named under each. Although item 3.b. instructs that the person identified—is a "[p]erson . . . served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made)," Katz indicated under 5.b. that he also left the documents with Choi as substituted service for the party. If Brian Choi in fact was the "person to be served" based on the inclusion of his name under item 3.b.—as opposed to Sklyar—then the proof of service would have checked item 5.a. "by personal service" to indicate Choi had been personally served with the documents "on behalf of an entity or as an authorized agent." In other words, if Choi was the person to be served, then—when Katz left the documents with Choi—he would have been personally serving Choi, not making substituted service on the parties through Choi.

Katz appears to have included Choi's name in item 3.b. either in error or to clarify that the substituted service was made through Choi (1) "for Dimitry Sklyar" and (2) again—in the proof of service for Magic—"for Dimitry Sklyar" but in his capacity as agent for service of process, and CEO, for Magic. "[M]inor, harmless deficiencies will not be allowed to defeat service." (*Bein, supra*, 6 Cal.App.4th at p. 1394 [declaration of attempted service not invalid for failing to identify the person to be served on behalf of a corporation].) In any event, nothing *on the face* of the proofs of service indicates Choi was not "an authorized agent" for Sklyar or Magic.[10]

---

[10] Moreover, as Vickers notes, a commercial mail receiving agency [CMRA] like Mail Boxes L.C. cannot "provide private mailbox receiving service to any customer" unless it gives the

Similarly, defendants argue the proofs of service did not identify Choi's relationship to Sklyar or Magic as item 5.b. instructs. Item 5.b. actually instructs the declarant to identify the "name and title or relationship to person indicated in item 3." Here, the proofs of service state Brian Choi is "of Mail Boxes L.C." That the proofs of service do not identify his exact title, or relationship to the parties, is a "harmless deficienc[y]," especially as they indicate Choi—as the person identified in item 5.b. with whom the documents were left—was "apparently in charge" of the location.

We thus reject defendants' contention that the judgment was invalid on its face for improper service. The court, however, considered both sides' extrinsic evidence. That evidence, some of which we already discussed, supports the court's finding that the service was valid. Defendants argue their evidence established service was defective. Sklyar declared: his residential and usual mailing address, his address as Magic's agent for service of process, and Magic's primary business and usual mailing address all were the North Hollywood address,[11] not the 2222 address;

---

customer "an acknowledgment . . . authoriz[ing] the CMRA to act as an agent for service of process." (Bus. & Prof. Code, § 17538.5, subd. (c).) In turn, anyone receiving such services is "required to sign an agreement . . . which authorizes the CMRA owner or operator to act as agent for service of process for" the customer. (*Id.*, subd. (d)(1).) Thus, Sklyar could not have maintained a mailbox at the 2222 address and Magic could not have received mail there—as Sklyar declared they did—without agreeing that the CMRA could accept service on their behalf.

[11] As we noted, the street number identified on the SOIs was different from the North Hollywood address.

20

and he hadn't lived at the La Canada address since 2006. Sklyar admitted he "maintained" a mailbox at the 2222 address, and Magic sometimes received mail there, but declared he didn't authorize anyone who worked at the 2222 address, including Choi, to accept service for him or Magic. Finally, Sklyar declared he never received in the mail "any summons or complaint addressed to" him individually or as the agent of Magic or anything from Choi.

The court also considered Katz's September 2022 declaration. Our reading of the declaration makes clear Katz intended to check box 5.b.(3), instead of 5.b.(1). Choices corresponding to the methods of substituted service under section 415.20 appear under item 5.b. to indicate the status of the identified individual. The two relevant here are: 5.b.(1) "**(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served"; and 5.b.(3) "**(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served . . . ."

The proofs of service checked box 5.b.(1) indicating the 2222 address was "the office or usual place of business of the person to be served." Mail Boxes L.C. was not Sklyar's or Magic's office or usual place of business. Katz, however, declared that, because he couldn't physically locate Sklyar, on July 7, 2021, he served Magic and Sklyar by leaving the documents at Magic's and Sklyar's "usual mailing address"—the 2222 address (Mail Boxes L.C.)—with "the person in charge" of that private mailbox (Brian Choi). Katz is clearly describing a person under 5.b.(3), rather than 5.b.(1). Katz also attested he confirmed with Choi that (1) Sklyar and Magic both received mail there; and (2) Choi

21

was "the person in charge of the private mailbox" for Sklyar and Magic. Katz declared, as he did in the proofs of service, that he then mailed a copy of the summons and complaint "to the person to be served" at the place where he had left them.

Katz's error in checking the wrong box under item 5.b. was minor and harmless. The procedure for effectuating substituted service was the same whether the 2222 address was the "office" or "usual place of business" or "usual mailing address" of "the person to be served." (§ 415.20, subds. (a), (b).) The court found Katz had "determined" the 2222 address was a usual mailing address for both defendants through his conversation with Choi, as well as having reviewed Magic's licensing information and check to Jossiv, both of which listed the 2222 address. And Sklyar admitted he maintained a mailbox there. The evidence supports the court's finding. The court also reasonably could conclude from the proofs of service themselves—as we discussed—and from Katz's declarations that Katz mailed the summons and complaint to Sklyar (individually and again as Magic's agent for service of process).

Moreover, the court found "there [we]re credibility issues with Sklyar's declaration." The court noted Sklyar declared he discovered the default judgment only in February 2024, but on July 26, 2023, he signed a declaration in support of Anton's motion for summary adjudication in this case—"a declaration where his name was in the caption for Defendants." The court noted Sklyar attempted to explain this "apparent inconsistency" by stating he had limited education and English skills and his

22

dyslexia prevented him from understanding the document.[12] The court found Sklyar's explanation "deliberately vague." The court also found defendants' failure to address Vickers' statement it personally served them in October 2021 raised "further credibility issues with Sklyar's evidence. These credibility questions color Sklyar's claims as to his actual notice and characterization on the various mailing addresses at issue on this motion."

We thus can infer that, in finding the substituted service proper, the trial court credited Katz's testimony over Sklyar's. We will not reweigh the evidence or revisit the court's credibility findings. (See *Banerjee, supra*, 87 Cal.App.5th at p. 43; *Christian Research Institute v. Alnor* (2008) 165 Cal.App.4th 1315, 1319 [reviewing court "may not reweigh the trial court's implicit credibility determination"].)

Finally, defendants—as they did in the trial court—argue substituted service at a private post office box is improper, relying on *Bonita Packing Co. v. O'Sullivan* (C.D.Cal. 1995) 165 F.R.D. 610. *Bonita Packing Co.* is not binding on this court. We decline to follow it. Rather, we follow the decisions from our own and sister district that have held: "The plain language of section 415.20, subdivision (b) authorizes substitute service at a defendant's usual mailing address, which includes a private/ commercial post office box." (*Ellard, supra*, 94 Cal.App.4th at

---

[12] Sklyar declared Jossiv asked him to execute the July 26 declaration but didn't tell Sklyar that he was a defendant. Due to his dyslexia, Sklyar didn't understand the documents "to say that [he] was a defendant."

p. 546; *Hearn v. Howard* (2009) 177 Cal.App.4th 1193, 1203 (*Hearn*) [same].)

In that same vein, defendants argue the substituted service on Sklyar did not comply with section 415.20, subdivision (c). That section states: "Notwithstanding subdivision (b), if the only address reasonably known for the person to be served is a private mailbox obtained through a [CMRA], service of process may be effected on the first delivery attempt by leaving a copy of the summons and complaint with the [CMRA] in the manner described in subdivision (d) of Section 17538.5 of the Business and Professions Code." (§ 415.20, subd. (c).) Defendants argue Vickers didn't establish the 2222 address was "the only known address for Sklyar," or that service was made as required under Business & Professions Code section 17538.5. Because Vickers demonstrated reasonable diligence as required under section 415.20, subdivision (b), the service at the 2222 address—a private mailbox at a CMRA—was not "the first delivery attempt" on Sklyar. Thus, subdivision (c) did not apply.

We conclude the court did not err in finding the service on defendants at the 2222 address "complie[d] with the law." As Division Two stated, quoting from *Bein, supra*, 6 Cal.App.4th at p. 1393: " '[A] "defendant will not be permitted to defeat service by rendering physical service impossible." [Citation.] "The evident purpose of . . . section 415.20 is to permit service to be completed upon a good faith attempt at physical service on a *responsible person* . . . ." [Citation.] Service must be made upon a person whose "relationship with the person to be served makes it more likely than not that they will deliver process to the named party." ' " (*Hearn, supra*, 177 Cal.App.4th at pp. 1202–1203.) The purpose of section 415.20 was achieved here by service on

24

the person in charge of the private mailbox where defendants received mail.  (*Hearn*, at p. 1203.)

### b. *Amount of default judgment*

#### i. Applicable law

"The relief granted to the plaintiff, if there is no answer, cannot exceed that demanded in the complaint."  (§ 580, subd. (a).)  Our Supreme Court has held "section 580 is to be interpreted, in accordance with its plain language, to deprive a trial court of jurisdiction to enter a judgment against a defaulting defendant which awards greater relief than that sought in the plaintiff's complaint."  (*In re Marriage of Lippel* (1990) 51 Cal.3d 1160, 1167.)  As our high court has explained, "the primary purpose of the section is to guarantee defaulting parties adequate notice of the maximum judgment that may be assessed against them."  (*Greenup v. Rodman* (1986) 42 Cal.3d 822, 826 (*Greenup*).)  In other words, "due process requires notice to defendants . . . of the potential consequences of a refusal to pursue their defense."  (*Id.* at p. 829 ["no matter how reasonable an assessment of damages may appear in the specific case, we cannot open the door to speculation on this subject without undermining due process—a protection to which every defendant is entitled"].)  Thus, "a default judgment entered in violation of section 580 is void and must be vacated."  (*Dhawan v. Biring* (2015) 241 Cal.App.4th 963, 975.)

Case law is clear that "[s]ection 580 requires *formal* notice of damages sought *through the complaint* and does not consider whether a defendant had actual or constructive notice."  (*Airs Aromatics, LLC v. CBL Data Recovery Technologies, Inc.* (2018) 23 Cal.App.5th 1013, 1019; see also *Greenup, supra*, 42 Cal.3d at p. 826 ["due process requires formal notice of potential liability"].)

25

Case law also is clear that, although the amount of a default judgment cannot exceed the damages pleaded in the complaint, the damages allegation need not appear in the prayer for relief. Rather, except in certain cases not at issue here, a defendant may "be notified by the prayer [citation] or allegations in the body of the complaint of the damages sought."  (*National Diversified Services, Inc. v. Bernstein* (1985) 168 Cal.App.3d 410, 417–418; see also *Greenup*, at pp. 829–830 ["the allegations of a complaint may cure a defective prayer for damages"].)

      ii.     The complaint gave Sklyar notice of the damages awarded in the default judgment

Here, although the prayer for relief did not allege a specific dollar amount of damages against Sklyar, it did ask that he be held jointly and severally liable—as a co-conspirator of the Kims—for the unpaid amount of the CA Judgment.  The body of the complaint, in turn, specifically defined the CA Judgment as that entered against the Kims on November 6, 2018, in the amount of $6,597,215, plus $2,297,416 in interest, with an additional $717 in interest accruing daily until its payment.  The complaint also alleged no part of the CA Judgment had been paid to date.  The prayer's reference to "the CA Judgment"—a defined term—thus incorporated the definition stated in the body of the complaint. (See, e.g., *Insurance Co. of State of Pennsylvania v. American Safety Indemnity Co.* (2019) 32 Cal.App.5th 898, 903–904, 909–910 [default judgment entered on complaint that did not specify amount of damages in prayer for relief but sought indemnity for damages alleged in an arbitration claim incorporated by reference in the body of—and attached as an exhibit to—the complaint did not violate section 580].)  The prayer and the allegations within the body of the complaint thus put Sklyar

26

on notice that he could be held liable for $8,894,631, plus $717 in daily interest from November 6, 2018, if he did not defend the action. (See, e.g., *People ex rel. Lockyer v. Brar* (2005) 134 Cal.App.4th 659, 668 (*Brar*) [holding complaint that sought statutory penalties of $2,500 for each violation of unfair competition law, and alleged that defendant had named a total of 1,500 doe defendants in three lawsuits in an attempt to circumvent the law, "gave fair warning of an exposure of at least $2,500 times 1,500, which is $3.75 million, which is more than the $1,785,000 in the default judgment"].)

Defendants argue the requested relief is not supported by any cause of action, as the only tort Sklyar was alleged to have committed was the fraudulent transfers. But the body of the complaint apprised Sklyar that he was being sued as the Kims' co-conspirator in a money-laundering scheme designed to prevent Vickers from collecting the CA Judgment. The complaint specifically stated Vickers was "seek[ing] an order . . . declaring Anton, ABC, Magic . . ., and Sklyar . . . co-conspirators and/or alter egos of the Judgment Debtors." In addition to the fraudulent transfers we have described, the complaint alleged Magic was Sklyar's "alter ego" and "a mere shell, instrumentality, and conduit used by Sklyar, Anton, and the Judgment Debtors to launder the funds stolen from Plaintiff, and to hide the Judgment Debtors' assets from . . . Plaintiff." Moreover, the civil conspiracy claim itself alleged Sklyar "knowingly and willfully conspired with the Judgment Debtors to defraud Plaintiff in the collection of the amounts owed to Plaintiff by the Judgment Debtors pursuant to the CA Judgment. [¶] To that end, [Sklyar and Anton] knowingly and willfully helped effectuate, and served as the recipients of, the Fraudulent

27

Transfers for the sole purpose of defrauding Plaintiff and allowing the Judgment Debtors to avoid their debt to Plaintiff under the Judgment."

As stated in *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 511, relied on by defendants, " ' "The elements of an action for civil conspiracy are the formation and operation of the conspiracy and damage resulting to plaintiff from an act or acts done in furtherance of the common design. . . . In such an action the major significance of the conspiracy lies in the fact that it renders each participant in the wrongful act responsible as a joint tortfeasor *for all damages ensuing from the wrong*, irrespective of whether or not he was a direct actor and regardless of the degree of his activity." ' " (Italics added.) Accordingly, as a co-conspirator engaged in the tortious conduct—the fraudulent transfers—to prevent Vickers from collecting on the CA Judgment, Sklyar could be held liable for "all damages" caused by the fraudulent transfers, including Vickers' inability to collect from the Kims on the CA Judgment. We therefore also reject defendants' contention that the civil conspiracy claim against Sklyar is limited to the amount of funds allegedly transferred between the Kims and Sklyar/Magic.

As defendants assert, the civil conspiracy claim alleges Vickers was damaged "in an amount that will be determined at trial but not less than $1,500,000," as "a direct and proximate result of" Sklyar's (and Anton's) participation in the conspiracy —a much smaller amount than the unpaid CA Judgment. Defendants argue the $1.5 million in damages alleged in the specific cause of action against Sklyar is inconsistent with the prayer's request that he be held liable for the unpaid amount of the CA Judgment—an amount not stated expressly in the prayer.

28

Defendants thus contend the complaint at most supported a damage award of $1.5 million against Sklyar—the only amount specifically alleged against him. (See *Traci & Marx Co. v. Legal Options, Inc.* (2005) 126 Cal.App.4th 155, 160 [in a default proceeding, demand of amount " 'in excess of' a specified dollar amount will result in an award of 'no more than' that dollar amount"].)

Both sides rely on *Barragan v. Banco BCH* (1986) 188 Cal.App.3d 283 (*Barragan*) where an appellate court affirmed the entry of a default judgment but reduced the $1 million awarded in compensatory damages to "the amount set forth in the prayer for relief," under section 580. (*Barragan*, at pp. 289, 305.) There, the amount of damages alleged in the complaint was inconsistent: specific causes of action alleged $1 million in compensatory damages, but the prayer for relief asked for general damages of $500,000. (*Id.* at p. 305.) The court concluded: "Because the prayer for relief controls, we modify the default judgment to provide for compensatory damages in the amount of $500,000." (*Ibid.*)

Vickers contends *Barragan* supports upholding the $10 million default judgment. Vickers essentially argues that, because the prayer demanded that Sklyar be found liable for the unpaid CA Judgment—the amount of which is pleaded in the body of the complaint—the prayer's demand trumps the lesser amount of damages alleged in the civil conspiracy cause of action. Defendants, in contrast, argue the decision in *Barragan* to limit the default to the lower amount demanded in the prayer was a logical way to resolve the conflicting allegations of specific damages, considering the amount was "being awarded on default." Defendants also note they are aware of no authority

29

"that would permit a default judgment to be entered in a *greater* amount than that claimed in the specific causes of action alleged when there is *no specific dollar amount identified in the prayer for relief*." (Underlining omitted.) Defendants thus argue the specific amount of damages—$1.5 million—alleged in the civil conspiracy cause of action should control over the general reference to joint and several liability for "the unpaid amount of the CA Judgment" in the prayer. *Barragan* did not articulate its reasoning other than to declare the prayer for relief—which alleged a specific dollar amount—controls. (*Barragan, supra,* 188 Cal.App.3d at p. 305.) We do not find the decision particularly helpful here.

As discussed, the civil conspiracy cause of action supports Sklyar's joint and several liability for the unpaid CA Judgment.[13] We do not view Vickers' demand for relief that Sklyar be found liable to pay the unpaid portion of the CA Judgment— $6,597,215 plus $2,297,416 in interest, plus $717 in interest accruing daily—as inconsistent with the allegation that Sklyar and Anton damaged Vickers in an amount of no less than $1,500,000 due to their participation in the civil conspiracy to help the Kims "avoid their debt" to Vickers under the CA Judgment. We read the alleged damages of "not less than $1,500,000" as setting the minimum amount of damages Sklyar's (and Anton's) direct actions within the conspiracy caused Vickers.

---

[13] Any damages for the fraudulent transfer cause of action would be limited to the fraudulent transfers made. (Civ. Code, §§ 3439.07, subd. (a); 3439.08, subd. (b)(1)(A).) And, Sklyar is not alleged to have been unjustly enriched in the amount of the CA Judgment under a theory of unjust enrichment.

30

In the civil damages claim against Anton, the complaint alleged Anton helped the Kims "conceal[ ] and withhold[ ] the Stolen Funds" from Vickers by receiving "at least $1,500,000 of those Stolen Funds." The civil conspiracy claim incorporated that allegation by reference (along with the allegations in every paragraph preceding it). The $1,500,000 clearly refers to fraudulent transfers Anton received, including from Sklyar using Magic Touch. But as discussed, Sklyar could be held liable for all damages caused by the conspiracy—even if he was not "a direct actor"—including Vickers' inability to collect any of the amounts owed under the CA Judgment from the Kims. (The alleged amount owed on the CA Judgment also was incorporated by reference in the civil conspiracy claim.) The prayer thus set the maximum amount of damages Sklyar could be held liable for as a co-conspirator—the unpaid amount of the CA Judgment.

Accordingly, we conclude the prayer for relief along with the clear and specific allegations stating the dollar amounts due —and continuing to accrue—on the unpaid CA Judgment gave Sklyar "adequate notice" that the entirety of the CA Judgment was "the maximum judgment that may be assessed against" him. (*Greenup, supra*, 42 Cal.3d at p. 826; see also *Brar, supra*, 134 Cal.App.4th at p. 667 ["courts must look to the prayer of the complaint *or* to 'allegations in the body of the complaint of the damages sought' to determine whether a defendant has been informed of the 'maximum liability' he or she will face for choosing to default"].) The court therefore properly found the default judgment was not void under section 580.[14]

---

[14] As the trial court noted in its ruling, defendants' "set aside argument" based on section 580 applied only to the monetary

31

**2.** *The amended judgment*

Magic contends, as it did in the trial court, that its appeal from the default judgment precluded the court from amending it, and the amendment did not correct a clerical error. We reject defendants' contention that the trial court lacked jurisdiction to amend the March 2023 judgment to correct a clerical error. (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185 [court's " 'inherent power to correct clerical errors in its records . . . is unaffected by the pendency of an appeal' "].) We agree, however, that the amendment did not correct a clerical error.

a. *Applicable law*

"It is well settled that a court has the inherent power to correct clerical error in its judgment so that the judgment will reflect the true facts. [Citation.] The power of a court to correct clerical mistakes in judgments is also a statutory power pursuant to section 473." (*Conservatorship of Tobias* (1989) 208 Cal.App.3d 1031, 1034 (*Tobias*); *Estate of Douglas* (2022) 83 Cal.App.5th 690, 695 [same]; § 473(d) ["court may, upon motion of the injured party . . . correct clerical mistakes in its judgment or orders as entered, so as to conform to the judgment or order directed"].)

"A clerical error in the judgment includes inadvertent errors made by the court 'which cannot reasonably be attributed to the exercise of judicial consideration or discretion.' [Citations.] 'Clerical error . . . is to be distinguished from judicial error which cannot be corrected by amendment. The distinction between

---

amount awarded against Sklyar, as defendants "concede[d] that the [d]efault [j]udgment awarded no monetary amount against Magic." We thus need not discuss the damages alleged against Magic.

clerical error and judicial error is "whether the error was made in rendering the judgment, or in recording the judgment rendered." [Citation.]  Any attempt by a court, under the guise of correcting clerical error, to "revise its deliberately exercised judicial discretion" is not permitted.  [Citation.]'  [Citation.]  A judicial error is the deliberate result of judicial reasoning and determination."  (*Tobias*, *supra,* 208 Cal.App.3d at pp. 1034–1035; see also *Tokio Marine & Fire Ins. Corp. v. Western Pacific Roofing Corp.* (1999) 75 Cal.App.4th 110, 117 (*Tokio Marine*) ["test which distinguishes clerical error from possible judicial error is simply whether the challenged portion of the judgment was entered inadvertently (which is clerical error) versus advertently (which might be judicial error, but is not clerical error)"].)

Whether to grant a motion under section 473(d) "is addressed to the sound discretion of the trial court and the trial court's order will not be disturbed absent a showing of clear abuse of discretion.  [Citation.]  Whether the error was clerical in nature is a matter for the trial court to determine.  [Citations.]  Great weight should be placed on the trial court's declaration as to its intention in signing the judgment as the nature of the error is seldom clear from the record or other extrinsic evidence."  (*Tobias, supra*, 208 Cal.App.3d at p. 1035.)  Nevertheless, a court "may not amend a judgment to substantially modify it or materially alter the rights of the parties under its authority to correct clerical error."  (*Rochin v. Pat Johnson Manufacturing Co.* (1998) 67 Cal.App.4th 1228, 1238 (*Rochin*).)

b.    *The amendment did not correct a clerical error*

The court entered the amended August 23, 2024 judgment after granting Vickers' ex parte application to correct the

33

March 2023 judgment for "clerical error" under section 473(d) "to conform to the judgment directed by the Court, that Magic . . . is liable to Vickers for $400,000 in fraudulent transfers," "by specifying the amount of fraudulent transfers for which Magic . . . is liable to Plaintiff, rather than simply incorporating that amount by reference to Paragraph 94 of the Complaint."

The default judgment the court entered on March 20, 2023 was the judgment Vickers proposed. The portion at issue "adjudged, ordered and decreed that:

> "1.     All Fraudulent Transfers by Jossiv Kim and Angelina Kim to Defendants Dmitry Sklyar and Magic Touch Repair, Inc., and from Magic Touch Repair, Inc., to Jossiv Kim and Angelina Kim, as referenced in paragraph 94 of the Complaint are voidable transfers within the meaning of Cal. Civ. Code § 3439.04, and thus void to the extent necessary to satisfy the amounts awarded to Plaintiff in the above-referenced November 6, 2018 Judgment of the Superior Court of California, County of Los Angeles . . . ."

On Vickers' application, the court amended paragraph 1 to add: "Paragraph 94 of the Complaint expressly states that 'Magic . . . received at least $400,000 in Stolen Funds' in fraudulent transfers from Jossiv Kim. Thus, defendant Magic . . . is jointly and severally liable in the amount of $400,000 to Plaintiff."

Vickers contends this amendment made clear the trial court's intent when it entered the March 2023 default judgment "was to award $400,000 against Magic . . . and in favor of Vickers." In other words, the court corrected an inadvertent

34

omission of the $400,000 award against Vickers. Vickers further argues the complaint's allegations and request for relief, as well as paragraph 1 of the original judgment, all demonstrate the court intended to award Vickers the $400,000 that paragraph 94 alleged Magic received. Vickers argues the court's intent also is apparent from its August 13, 2024 ruling—denying Magic's third-party claim of ownership—that Vickers had a " 'superior interest' " to funds in the frozen accounts "because Magic . . . owes Vickers $400,000, pursuant to Paragraph 1" of the judgment. Finally, Vickers asserts we must defer to the trial court's express determination that the amendment corrected a clerical error—stated in its minute order and the amended judgment itself. Although the court may have believed that adding the $400,000 award corrected a clerical error—and we agree the court has the power to correct clerical errors, even where made by counsel (*Ames v. Paley* (2001) 89 Cal.App.4th 668, 672 (*Ames*))—we conclude any error in omitting the $400,000 award was made in rendering, rather than recording, the judgment. (*Tobias, supra*, 208 Cal.App.3d at pp. 1034–1035.)

First, contrary to Vickers' assertion, the record demonstrates the court intended the judgment it actually entered and does not support finding the court inadvertently omitted the specific $400,000 award. As defendants note, the court's March 15, 2023 ruling granting Vickers' request for entry of default judgment—as to both Magic and Sklyar—does not mention a specific monetary award against Magic. Rather, the court explained, "The Complaint requests a judgment that all fraudulent transfers by Jossiv and Angelina to Magic . . . be found voidable. In addition, Plaintiff requests that Defendant Sklyar be jointly and severally liable for any unpaid amounts of

35

the judgment as a co-conspirator of Jossiv, Angelina, and Anton." The court then summarized the requested judgment, as follows:

| | |
|---|---|
| "Compensatory Damages: | $8,894,631[15] |
| "Prejudgment Interest (10% per year): | $1,013,838 |
| . . . | |
| "Total: | $9,904,969 ($3500 credit for sale of vehicle)" |

The court's ruling discussed the requested compensatory damages. The court found the amounts awarded in the CA Judgment were "for $6,597,215 and $2,297,416 in interest," totaling $8,894,631. Exercising its judicial function, the court awarded the requested total damages and interest—it did not mention carving out a $400,000 award against Magic. Five days later, the court entered the exact judgment Vickers requested, which reflected the precise relief the complaint demanded.

In other words, nothing in the record demonstrates the court expressly ordered Magic was jointly and severally liable to Vickers for $400,000, but Vickers mistakenly omitted that provision from the proposed judgment, or that the court inadvertently failed to add it. (Cf. *Ames, supra*, 89 Cal.App.4th at p. 673 [where judgment " 'inadvertently omits a provision expressly ordered inserted, the failure to include it is clerical' "].) Rather, the court intentionally adopted the language of the proposed judgment—there was no inadvertent omission of the $400,000 award. (*Machado v. Myers* (2019) 39 Cal.App.5th 779,

---

15    Vickers' application for court judgment against Magic and Sklyar—under "[j]udgment to be entered"—identified the "[d]emand of complaint" as $8,894,631.

782–783, 798 [where court entered judgment plaintiffs had "requested upon application," error in judgment "to reflect all the terms" of the parties' stipulated settlement agreement "was judicial, not clerical"—as court "*intentionally* [had] adopted" the language of the judgment—and thus could not be remedied under § 473(d)]; cf., e.g., *Ames*, at pp. 669–670, 673–674 [court had inherent power to correct judgment for clerical error where it intended to enter judgment in accordance with the precise terms of the parties' settlement agreement, but judgment had omitted a date referenced in the parties' agreement]; *In re Marriage of Kaufman* (1980) 101 Cal.App.3d 147, 149–151 [court did not exercise a judicial function in signing judgment counsel drafted that court assumed correctly reflected the order of the court; correction of judgment to conform to court's order was correction of clerical error]; *Estate of Douglas, supra*, 83 Cal.App.5th at pp. 692–693 [omission from requested renewal of judgment of the judgment debtor's role as administrator of an estate—identified in original judgment—was a clerical error].) That Vickers realized almost a year and a half later that it couldn't execute the judgment against Magic unless it added the $400,000 award did not render the omission of the $400,000 award an inadvertent clerical error. (See *Tokio Marine, supra*, 75 Cal.App.4th at pp. 117–118 [" 'If the court misconstrued the evidence before it, or misapplied the law applicable to the facts disclosed by the evidence, or was even misled by counsel, such an error was in no sense a clerical error. . . .' "], quoting *Lankton v. Superior Court* (1936) 5 Cal.2d 694, 696.)

Moreover, amending the judgment to make Magic "jointly and severally liable in the amount of $400,000" to Vickers "substantially modif[ied]" the judgment, and/or "materially

37

alter[ed] the rights of the parties." (*Rochin, supra*, 67 Cal.App.4th at p. 1238.) Critically, a joint and several award of $400,000 against Magic does not automatically flow from the judgment's decree that the fraudulent transfers "referenced in paragraph 94 of the [c]omplaint are . . . void to the extent necessary to satisfy the amounts awarded to [Vickers] in the [CA Judgment]." Although paragraph 94a. of the complaint alleged Magic received at least $400,000 in stolen funds from the Kims, that paragraph also alleged "Sklyar, using Magic" transferred at least $350,000 back to Jossiv. The March 2023 judgment's reference to the fraudulent transfers "in paragraph 94 of the Complaint," thus included the $350,000 returned to Jossiv.[16]

In any event, the complaint did not ask the court to find Magic "jointly and severally" liable for payment of $400,000— nor did the request for entry of default judgment. Rather,

_____

[16]    We do not suggest Vickers would be unable as a matter of law—as defendants argue—to recover the $400,000 allegedly fraudulent transfer to Magic. (See Civ. Code, § 3439.08, subd. (b)(1)(A) ["creditor may recover judgment for the value of the asset transferred, . . . or the amount necessary to satisfy the creditor's claim, whichever is less," from "[t]he first transferee of the asset"]; *Haskins v. Certified Escrow & Mortgage Co.* (1950) 96 Cal.App.2d 688, 691 ["[a] creditor does not sustain injury unless the transfer puts beyond his reach property which he otherwise would be able to subject to the payment of his debt"]; *Hickson v. Thielman* (1956) 147 Cal.App.2d 11, 15 [transferee who received money with intent and purpose to defraud transferor's creditors "would not have [been] relieved [of] her . . . responsibility" by returning the money to transferor].)

Vickers alleged it was entitled to a judgment "awarding recovery of as much of the proceeds or value [of the fraudulent transfers] from Sklyar and Magic . . . in an amount necessary to satisfy the debt owed to [Vickers]." The prayer then asked for a judgment "avoiding" the referenced fraudulent transfers "to the extent necessary to satisfy the amounts awarded to [Vickers] in the CA Judgment." That is exactly what the March 2023 judgment ordered.

Nor can we conclude the court's after-the-fact ruling that Magic owed Vickers $400,000 based on paragraph 1 of the judgment demonstrates the court intended—at the time it entered the default judgment—to include the omitted term specifically making Magic jointly and severally liable to Vickers for that amount. Indeed, the court was aware the judgment did not include a monetary award against Magic, having acknowledged defendants' concession in their 473(d) motion that it didn't. (See *Tokio Marine, supra*, 75 Cal.App.4th at pp. 117–118 [adding underwriters as judgment debtors did not correct clerical error where there was no evidence court had intent "at the time of rendition of judgment" to include them as judgment debtors or that they were omitted through "mere inadvertence"].)

Accordingly, we conclude the court erred in granting Vickers' ex parte application to amend the March 2023 judgment under section 473(d) and we vacate the amended judgment.

## DISPOSITION

We affirm the order denying defendants' motion for relief from the March 20, 2023 default judgment and reverse the order granting plaintiff's ex parte application to amend the default judgment. We vacate the August 23, 2024 amended judgment and direct the court to reinstate the March 20, 2023 default judgment. Vickers is to recover its costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, J.

We concur:

EDMON, P. J.

ADAMS, J.